The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
September 12, 2019

**2019COA145**

**No. 17CA1299, *People v. Avila* — Criminal Law; Juries — Challenges for Cause — Compensated Employee of a Public Law Enforcement Agency**

In this appeal of a defendant's criminal conviction, a division of the court of appeals considers whether a prospective juror who is employed by the Colorado Office of Prevention and Security's "fusion center" is a "compensated employee of a public law enforcement agency." The division answers "no" and, after addressing defendant's remaining contentions, affirms the judgment of conviction.

Court of Appeals No. 17CA1299
Adams County District Court No. 16CR185
Honorable Sharon D. Holbrook, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Tina Louise Avila,

Defendant-Appellant.

## JUDGMENT AFFIRMED

Division I
Opinion by JUDGE HAWTHORNE
Taubman and Grove, JJ., concur

Announced September 12, 2019

Philip J. Weiser, Attorney General, Rebecca A. Adams, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jessica Sommer, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Is a prospective juror who is employed by the Colorado Office of Prevention and Security's "fusion center" a "compensated employee of a public law enforcement agency?" We answer "no," and after addressing the remaining contentions of defendant, Tina Louise Avila, we affirm the judgment of conviction entered on jury verdicts finding her guilty of possessing a controlled substance and resisting arrest.

*I.    Factual Background and Procedural History*

¶ 2     Avila was at a bar early one morning, and the staff asked her to leave. She refused, they argued, and the staff called police. Avila was outside the bar when police arrived. She appeared upset and intoxicated, and told the officers about the argument. Without prompting, Avila said, "I don't have anything on me" and "you don't have shit on me." Avila avoided making eye contact with the officers and put her hands in her pockets numerous times, even after being told not to do so by the officers.

¶ 3     One officer conducted a pat-down search of Avila, and she became agitated, again telling the officer that she didn't have anything on her. When the officer reached toward Avila's pocket, she resisted, and the officer arrested her.

1

¶ 4    The arresting officer took Avila to jail, where another officer searched her.  That officer found a small piece of white paper with a powdery substance in it.  The substance was sent to the Colorado Bureau of Investigation (CBI), where an analyst tested it and identified it as cocaine.

¶ 5    The arresting officer and the analyst testified at trial for the prosecution.  The arresting officer said that he believed the white paper was found in Avila's bra or pocket, but he wasn't positive which one.  The analyst said he was unable to weigh the cocaine because it coated the inside of the plastic bag used to store it, so he could only shake out a portion of the material to test.

¶ 6    The jury convicted Avila of possessing a schedule II controlled substance and resisting arrest.

    II.    *Sufficient Evidence Supported the Possession Conviction*

¶ 7    Avila contends that insufficient evidence supported her conviction for possessing a controlled substance.  "Because this is a dispositive issue," we address it first and conclude that the evidence was sufficient.  *People v. Rawson*, 97 P.3d 315, 323 (Colo. App. 2004), *as modified on denial of reh'g* (May 6, 2004).

## A. Standard of Review and Applicable Law

¶ 8    We review the evidence's sufficiency de novo. *People v. Davis*, 2012 COA 56, ¶ 11.

¶ 9    Constitutional due process requirements prohibit a defendant's criminal conviction except on proof of guilt beyond a reasonable doubt. *People v. Serra*, 2015 COA 130, ¶ 18. To determine whether sufficient evidence supported a conviction, we ask "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty . . . beyond a reasonable doubt." *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010) (citation omitted).

¶ 10    We must afford the prosecution the benefit of every reasonable inference that may be fairly drawn from the evidence. *Id.* at 1292. These inferences must be supported by a "logical and convincing connection between the facts established and the conclusion inferred." *People v. Perez*, 2016 CO 12, ¶ 25. But inference may not rest on inference, *People v. Ayala*, 770 P.2d 1265, 1268 (Colo.

1989), nor can an inference "be supported by guessing, speculation, conjecture, or a mere modicum of relevant evidence." *Perez*, ¶ 25.

¶ 11      "[I]t is unlawful for a person knowingly to possess a controlled substance," § 18-18-403.5(1), C.R.S. 2018, which includes cocaine. § 18-18-204(2)(a)(IV), C.R.S. 2018. And a jury may return a guilty verdict "if it finds, beyond a reasonable doubt, that the defendant knowingly possessed *any* quantity of a controlled substance." *Richardson v. People*, 25 P.3d 54, 58 (Colo. 2001) (citing *People v. Ceja*, 904 P.2d 1308, 1310 (Colo. 1995)). Where there is "evidence of a usable quantity," that "alone is sufficient evidence of knowledge to permit the case to go to a jury." *Id.* But if "the quantity involved is so minute that it amounts to only a trace, there is no basis, from that fact alone, for any logical or reasonable inference that the defendant had knowledgeable possession." *People v. Theel*, 180 Colo. 348, 350, 505 P.2d 964, 966 (1973); *see Ceja*, 904 P.2d at 1311 ("Absent a usable quantity, the prosecution must present other evidence from which a jury can reasonably infer knowledge.").

## B.      Analysis

¶ 12      Avila asserts that the evidence established she only possessed a "mere residue of cocaine," and the prosecution didn't present

sufficient additional evidence from which the jury could infer that she knowingly possessed it.

¶ 13    The analyst testified at trial that he couldn't weigh the substance because it was inside "a heat sealed bag . . . with static electricity.  It was coating the inside of the bag.  So I could only shake out a little bit of the material.  My report calls it a residue."  When asked if there was enough material to adequately test it, the analyst responded, "Oh yes, there was."  The analyst's report, admitted at trial, described the substance as ".5 [g]rams of white cocaine powder substance" and "a schedule II controlled substance residue."

¶ 14    The record evidence doesn't establish whether the cocaine powder found on Avila was a usable quantity.  While the analyst's report states the substance's weight, the analyst said at trial that he didn't actually weigh it.  And the substance itself isn't in the appellate record.  But our supreme court has found as little as 0.16 grams of cocaine to be a usable quantity.  *People v. Stark*, 691 P.2d 334, 337-39 (Colo. 1984) ("The amount of cocaine seized, while not a large weight, was a usable quantity and not a 'mere trace.'") (citation omitted).

¶ 15     But even if we assume the evidence didn't establish that the cocaine powder found on Avila was a usable quantity, other sufficient evidence supported the jury's finding that Avila knowingly possessed it.

¶ 16     When officers contacted Avila, she acted evasively by refusing to make eye contact with them and continuing to put her hand in her pocket despite being ordered by one officer not to do so.  And she made unprompted statements that she didn't have anything on her.  *See Ceja*, 904 P.2d at 1311 ("[T]he prosecution introduced evidence that [defendant] . . . acted in an evasive manner when confronted by the police officer."); *see also People v. Richardson*, 8 P.3d 562, 564 (Colo. App. 2000) ("A reasonable fact finder could infer that his . . . denial was motivated by his guilty knowledge of the existence of the drug within the wallet."), *aff'd*, 25 P.3d 54 (Colo. 2001).  She also acted confrontationally toward the officers, resisted one officer's attempt to search her, and resisted arrest.  *See People v. Yeadon*, 2018 COA 104, ¶ 28 (sufficient evidence existed for jury to infer that defendant knowingly possessed methamphetamine where, in part, "[t]he evidence demonstrated that . . . [defendant] fled from the accident" where the

6

methamphetamine was found) (*cert. granted* Mar. 25, 2019). From this evidence, the jury could have inferred that Avila knowingly possessed the cocaine powder found on her later.

¶ 17     Also, the paper wrapping holding the cocaine, described as a "bindle" at trial, was found on Avila, and the arresting officer testified that he thought it was either in her bra or in a pocket. The jury could also have inferred knowing possession from the cocaine's location and packaging. *See Richardson*, 8 P.3d at 564 ("The methamphetamine was packaged in a manner to preserve it, and it was located in a wallet containing several documents identifying defendant."); *see also Ceja*, 904 P.2d at 1311 ("[T]he prosecution introduced evidence that Ceja owned the fanny pack in which the cocaine was found[.]").

¶ 18     Viewing this evidence in the light most favorable to the prosecution, including all reasonable inferences fairly drawn from it, we conclude sufficient evidence supported the jury's finding that Avila knowingly possessed the cocaine.

### III. The District Court Didn't Err in Declining to Strike Prospective Juror E.D. for Cause

¶ 19     Avila contends the district court erred in denying her challenge for cause as to prospective juror E.D. because (1) he was legally biased as a "compensated employee of a public law enforcement agency" under section 16-10-103(1)(k), C.R.S. 2018; and (2) he was actually biased. We disagree as to the first contention and don't address the second one.

### A. Standard of Review and Applicable Law

¶ 20     We review de novo whether a prospective juror is a public law enforcement agency's compensated employee. *People v. Sommerfeld,* 214 P.3d 570, 572 (Colo. App. 2009).

¶ 21     We agree with the People that, at trial, Avila didn't challenge the prospective juror for cause based on actual bias. Thus, this challenge is waived, and we don't address it. *See* Crim. P. 24(b)(2); *People v. Romero,* 197 P.3d 302, 305 (Colo. App. 2008) ("The challenge is waived, however, if it is not made before the jurors are sworn in.").

¶ 22     A trial court must sustain a challenge for cause to any prospective juror who is a public law enforcement agency's

8

compensated employee.  § 16-10-103(1)(k); *accord* Crim. P. 24(b)(1)(XII).  A public law enforcement agency is "a division or subdivision of state or federal government that has the authority to investigate crimes and to arrest, prosecute, or detain suspected criminals."  *People v. Bonvicini*, 2016 CO 11, ¶ 11; *Ma v. People*, 121 P.3d 205, 210 (Colo. 2005).  Numerous government agencies are statutorily designated as public law enforcement agencies, including "any police department, sheriff's department, or district attorney's office; the office of the state attorney general; the Colorado bureau of investigation[]; and the Colorado state patrol." *People v. Speer*, 255 P.3d 1115, 1121 (Colo. 2011).

¶ 23   But "simply because a state or federal agency holds investigative powers or has contact with law enforcement personnel does not render the agency a 'public law enforcement agency' within the meaning of the statute."  *People v. Urrutia*, 893 P.2d 1338, 1345 (Colo. App. 1994).  The agency's predominant purpose or mission must also be considered.  *See Speer*, 255 P.3d at 1122 ("Neither [the United States Department of Homeland Security or the Transportation Safety Administration] has as its predominant purpose or mission the enforcement of penal laws."); *People v.*

9

*Carter*, 2015 COA 24M-2, ¶ 20 ("Although the [Colorado Public Utilities Commission] has some authority to arrest and investigate a limited assortment of criminal violations, its primary functions involve the civil regulation of public utilities, services, and rates."); *People v. Simon*, 100 P.3d 487, 491 (Colo. App. 2004) ("[T]he [Environmental Protection Agency] is properly characterized as an investigatory and rulemaking body, and not a law enforcement agency[.]").  If an agency's law enforcement authority "is not merely incidental to but is an integral part of its essential functions," that supports a conclusion that it's a public law enforcement agency. *Sommerfeld*, 214 P.3d at 573.

¶ 24    We focus on "the nature of the employing agency rather than the specific duties of the venireman in question"; thus, "that the job description of any particular venireman may not directly involve law enforcement functions is not dispositive of his ability to sit."  *Speer*, 255 P.3d at 1120-21; *see People v. Scott*, 41 Colo. App. 66, 68, 583 P.2d 939, 942 (1978) (concluding that challenges for cause to a counselor and baker employed by the Colorado State Penitentiary should have been sustained).

## B. Additional Facts

¶ 25    At trial, defense counsel raised her concern that prospective juror E.D. was employed by a public law enforcement agency, and the court conducted an in camera hearing with counsel. At the hearing, E.D. stated that he worked for "the State Homeland Security Fusion Center," whose role is to provide "analytical support to investigations throughout Colorado and law enforcement agencies . . . across the state." He further specified that "[i]f any agency requests services, much like CBI, if they request a driver's license photo request, or any workups on individuals, they can request it from us." He also said that the fusion center provides "[c]riminal background history . . . . If [an agency] want[s] us to look at GPS data . . . we can do analysis for that. If they are doing a high-risk warrant [and] want a law enforcement workup on an individual to see if there [are] any dangerous things in their criminal history, we can do [that.]" He also said his daily work "involves taking law enforcement reports from those criminal justice agencies, law enforcement agencies, and redirecting them to law enforcement across the state."

¶ 26    E.D. was asked if he worked with non-law enforcement agencies, and he responded that he also worked with "emergency medical" and "all public safety agencies." When asked whether his work required having "contact with criminals," he responded that "[w]e don't do investigation. We do analytical support. We don't have an investigatory side of our office. If an agency requests pulling background information, we can do that. We can't initiate an investigation or conduct investigation unless we are working with the agency." When asked if his agency's role had changed over time, he noted that an "auto theft coordination center was created inside of our office. They look at auto theft across the State of Colorado, along with a couple other functions. . . . [W]e are [also] doing more strategic functions, looking at . . . drug trafficking organizations . . . ." The court asked E.D. if his agency investigated crimes, and he replied: "We [aren't] lead investigators." He then provided an example of his work, where a police department "wanted to have . . . support because they had cell phone pings that they wanted mapped. They requested us to do those mappings and link analysis. . . . So once we finished it, we handed it to [the police department.]"

¶ 27 Defense counsel asked E.D. how the fusion center compared to CBI, to which he responded,

> CBI has statutory authority to conduct investigation[s] if agencies ask. We can't conduct investigations. We can just support the investigator. So if they request background checks, driver's license photos, any of that, they have to request it of us. We can give it to them. Unlike CBI, where they can bring in CBI, conduct investigation with them. We can't do it without the local agency.

The court followed up by asking, "[Y]ou don't arrest anyone, prosecute anyone, [or] detain anyone?" E.D. responded, "Negative."

¶ 28 Defense counsel argued that E.D. worked for a public law enforcement agency because he primarily worked with law enforcement officers investigating crimes, which was the agency's main purpose. The court disagreed, finding that E.D. and his agency didn't perform "any of the traditional law enforcement functions[.]" It denied defense counsel's request to strike E.D. for cause. Defense counsel later exhausted her peremptory strikes.

### C. Analysis

¶ 29 Avila asserts that E.D.'s employer, "[t]he Homeland Security Fusion Center[,] is a public law enforcement agency . . . because its primary mission is to enforce criminal laws."

¶ 30 The General Assembly created the Office of Prevention and Security (OPS) within the Colorado Division of Homeland Security and Emergency Management (DHS). § 24-33.5-1603(2)(b), C.R.S. 2018. OPS is tasked with "[o]perating the state's fusion center," as well as "[e]nhancing interagency cooperation through information sharing" and "[d]eveloping and maintaining, through cooperation with other tribal, state, local, regional, and federal agencies, a standardized crisis communication and information-sharing process." § 24-33.5-1606(2), C.R.S. 2018.

¶ 31 The fusion center is defined as "the program administered by [OPS] . . . that serves as the primary focal point within the state for receiving, analyzing, gathering, and sharing threat-related information among federal, state, local, tribal, nongovernmental, and private sector partners." § 24-33.5-1602(8), C.R.S. 2018.

¶ 32 We conclude that the fusion center isn't a "public law enforcement agency" under section 16-10-103(1)(k) because it isn't a "police-like division of government that has the authority to investigate crimes and to arrest, to prosecute, or to detain suspected criminals." *Ma*, 121 P.3d at 211; *see Romero*, 197 P.3d at 307 (collecting cases and noting that prior case law had found an

14

agency was not a public law enforcement agency when it "did not have the authority to arrest, prosecute, or detain suspected criminals, or any such authority was entirely incidental to the agency's essential functions").

¶ 33     While the fusion center, as E.D. described it, provides investigatory support to law enforcement officials, it doesn't have the authority to investigate crimes on its own.  Any such support is only provided after it's requested by law enforcement officials.  As to the broader "strategic" initiatives, such as "looking at" statewide auto theft and drug trafficking, it's unclear whether investigations are conducted without request.  E.D. said that the fusion center cannot "initiate an investigation or conduct investigation unless we are working with [an] agency."  During the in camera review, the court followed up by asking "when you say that if the agency requests it of you to do an investigation, it sounds to me that [it's] just the data and the analytical support, you are not reaching conclusions, you are giving the information to the agency for them to reach a conclusion?"  E.D. agreed.

¶ 34     So the record doesn't support concluding that the fusion center has the authority to investigate crimes.

¶ 35     The record also doesn't support concluding that the fusion center has the authority to "arrest, prosecute, or detain suspected criminals." *Bonvicini*, ¶ 11.  E.D. denied having any authority to arrest, prosecute, or detain anyone.  *See Speer*, 255 P.3d at 1122 ("[T]he prospective jurors denied having any authority to detain or make arrests. . . . Neither juror gave the slightest indication that their employing unit prosecuted suspected criminals[.]"); *People v. Zurenko*, 833 P.2d 794, 796 (Colo. App. 1991) ("While certain personnel of DSS [the Department of Social Services] investigate complaints of abuse, these personnel have no power to arrest or prosecute offenders.  Thus, the trial court did not err by refusing defendant's challenge for cause to the juror employed by DSS.").

¶ 36     Also, the fusion center's purpose, while somewhat related to law enforcement, isn't to enforce criminal laws.  Instead, it "serves as the primary focal point within the state for receiving, analyzing, gathering, and sharing threat-related information." § 24-33.5-1602(8).  Prospective juror E.D. said that the fusion center works with "emergency medical" and "all public safety agencies" in addition to law enforcement agencies.  While the work he described mostly involved assistance to law enforcement agencies, an agency

16

having "contact with law enforcement personnel" doesn't alone "render the agency a 'public law enforcement agency' within the meaning of the statute." *Urrutia*, 893 P.2d at 1345.

¶ 37   Further, the fusion center isn't DHS's or OPS's "law enforcement branch." *Ma*, 121 P.3d at 212. Nor are its employees "trained and authorized to arrest suspected criminals, to investigate crimes, and to detain prisoners." *Id.* Thus, the fusion center's "predominant purpose or mission" isn't "the enforcement of penal laws." *Speer*, 255 P.3d at 1122.

¶ 38   While OPS's manager is a statutorily designated peace officer, § 24-33.5-1606(1)(b), OPS and fusion center employees aren't, unlike CBI agents. *Compare* § 24-33.5-1606(1)(b) (OPS's manager is a designated peace officer), *with* § 16-2.5-113, C.R.S. 2018 (designating CBI's director and CBI "investigation agent[s]" as peace officers). Regardless, an agency's employees being "classified by statute as 'peace officers' while engaged in their duties is not determinative." *Carter*, ¶ 17.

¶ 39   Because we focus on the nature of the employing agency rather than the specific duties of the prospective juror in question, *Speer*, 255 P.3d at 1120-21, we conclude the fusion center isn't a

public law enforcement agency, and thus the court didn't err in denying Avila's challenge for cause as to prospective juror E.D.

### IV. The District Court's Reasonable Doubt Illustrations Didn't Violate Avila's Due Process Rights

¶ 40 Avila contends that the district court's reasonable doubt illustrations during voir dire impermissibly lessened the prosecutor's burden of proof, violating her right to due process. We disagree.

### A. Additional Facts

¶ 41 During voir dire, the district court instructed the prospective jurors as to the definition of reasonable doubt using an instruction that mirrored the model jury instructions. *See* COLJI-Crim. E:03 (2018). The court also explained that the beyond a reasonable doubt standard applies to every element of a charged crime. Later, during voir dire, the court returned to reasonable doubt, describing it as "a concept that is difficult for all of us to understand." The court then provided an illustration "in terms that everybody can kind of get their head around."

> THE COURT: . . . Have you ever purchased a home?
>
> JUROR: Yes.

THE COURT: All right. If you were going to purchase a home and you were doing the walk-thru after you made the offer, with the inspector, right, looking at all aspects of the house, and you saw a little crack in the foundation, or up in the corner of one of the walls, what would you do?

THE JUROR: I would inquire about the crack, why it is there.

THE COURT: . . . Exactly. In Colorado that is common to have a few cracks here and there with our soil, okay? If you saw a huge crack going all the way across the slab, what would you think, would you still want to buy the house?

THE JUROR: No.

THE COURT: Okay. All right. That was enough then to make you not feel comfortable in acting in a matter of importance to yourself. Is that fair?

THE JUROR: Yes.

. . . .

THE COURT: . . . There is no such thing as beyond a shadow of a doubt. It is beyond a reasonable doubt. It is a doubt that is based on reason, right? You could have a couple cracks. You don't have to know everything about the case. None of us were there. You told me that. None of us saw what happened. So there is really no way to know beyond all doubt what happened. You could still have a reasonable doubt. There could be a few pieces missing. They can't be big pieces or that big crack in the slab. Does that make sense? We

19

hold the prosecution to a high burden, but not an unreasonable burden. Does that make sense?

THE JUROR: Yes.

¶ 42     The court then asked another prospective juror if she understood "reasonable doubt" and provided another illustration:

THE COURT: Are you comfortable using the standard of beyond a reasonable doubt in evaluating evidence?

THE JUROR: I think so. I mean, I don't have any experience with it, but I would say I would be, yes.

THE COURT: Would you agree we sort of do this all the time in our personal lives? Everything from buying produce? How many brown spots are too many for me to buy this apple all the way up to the big house decision. If it is a matter of importance to yourself. You take a critical look at all of the surrounding circumstances. Is that fair to say?

THE JUROR: Yes.

Avila didn't object to the court's illustrations.

### B.     Standard of Review and Applicable Law

¶ 43     We review de novo whether a jury instruction accurately informed the jury of the law or whether, to the contrary, it impermissibly lowered the prosecution's burden of proof and requires reversal. *Johnson v. People*, 2019 CO 17, ¶¶ 8-9.

¶ 44    "When reviewing an ambiguous jury instruction . . . we ask whether there is a reasonable likelihood that the jury applied the contested instruction in an unconstitutional manner." *Id.* at ¶ 14; *see Victor v. Nebraska,* 511 U.S. 1, 6 (1994). "As the Supreme Court cautioned . . . attempts to further define reasonable doubt do not provide clarity. Even if well-intentioned[.]" *Johnson,* ¶ 19; *see, e.g., Carter,* ¶ 58 ("Given the case law from other jurisdictions, we will assume, without deciding, that the trial court improperly analogized the concept of reasonable doubt to a puzzle.").

¶ 45    But we don't consider the instruction in isolation. *Johnson,* ¶ 14. Instead, if "[i]n the context of the entire record . . . the trial court properly instructed the jury on the law — even with 'objectionable language . . . [in] the trial court's elaboration of the reasonable doubt instruction' — then there is no violation of due process." *Id.* (quoting *People v. Sherman,* 45 P.3d 774, 779 (Colo. App. 2001)). So, when the trial court uses an illustration to explain the concept of reasonable doubt, we consider the illustration's nature, scope, and timing in determining whether its use violated due process. *See People v. Villa,* 240 P.3d 343, 357 (Colo. App. 2009); *see also Johnson,* ¶ 18 ("We note that the trial court provided

21

the instruction to the jury verbally and only once. It was not mentioned or referenced again throughout the entirety of the proceedings, including closing arguments.").

### C. *Analysis*

¶ 46 We conclude that the court's illustrations didn't lower the prosecution's burden of proof because "[i]n the context of the entire record, the trial court properly instructed the jury on the law." *Johnson*, ¶ 16.

¶ 47 The illustrations here were limited to voir dire. Neither the district court nor trial counsel mentioned them after the jury was selected. Also, the court properly defined the beyond a reasonable doubt standard for the jury in accordance with the model jury instructions, once during voir dire, and again orally and in writing before deliberations. *Id.* at ¶¶ 16-18; *see also People v. Van Meter*, 2018 COA 13, ¶ 33 (considering an improper analogy's brief and isolated use followed by a correct jury instruction on reasonable doubt in determining whether plain error occurred). And during closing arguments, the prosecutor and defense counsel referenced the proper reasonable doubt definition and directed the jury to follow it. *See People v. Cevallos-Acosta*, 140 P.3d 116, 124 (Colo.

22

App. 2005). The court also explained that the prosecutor must prove every element of the charged offense beyond a reasonable doubt. We presume the jury followed the court's instructions. *Johnson*, ¶ 14.

¶ 48     So the court's illustrations as to reasonable doubt didn't lower the prosecution's burden of proof.

### V.     *Extraneous Information Presented to the Jury Didn't Violate Avila's Due Process Right to a Fair Trial*

¶ 49     Avila contends that the district court plainly erred by refusing to declare a mistrial because two prospective jurors exposed the jury to extraneous information about the arresting officer during voir dire, violating her right to a fair trial. We disagree.

### A.     *Additional Facts*

¶ 50     During voir dire, the district court had the following discussion with a prospective juror:

> THE COURT: . . . [I]f I had to ask you for a verdict right now, before you heard any evidence, what would you have to say, guilty or not guilty?
>
> JUROR: I would have to say guilty.
>
> THE COURT: Why would you say guilty?
>
> JUROR: Because I know the officer involved, and I think he is a standup person. If [a

charge] is resisting arrest, I have a predisposition to believe him.

The prosecutor later questioned the prospective juror:

> COUNSEL: Okay.  I know that you know [the arresting officer].  Let's talk about that.  Do you have concerns about it affecting your fairness?
>
> THE JUROR: Yes.
>
> COUNSEL: Okay.  Can you tell us about that, other than what you have already said?
>
> THE JUROR: Not really.  I have — I know him.  I know him to be an upstanding officer.  I have had dinner with him, sat at my kitchen table with him, included him in family activities.  So I think I am predisposed to agree with what he says.
>
> COUNSEL: Do you have concerns about being fair to the defense?
>
> THE JUROR: I do.

Avila didn't object to these comments.  The prospective juror was later removed for cause.

¶ 51     Later during voir dire, the prosecutor asked another prospective juror about his relationship with the arresting officer:

> COUNSEL: [Do] you know [the arresting officer] as well?
>
> THE JUROR: I am his dentist. . . .  He is my patient, my friend.

24

. . . .

COUNSEL: Do you think you can be fair in this case even though you know him?

THE JUROR: I believe it would be very difficult to completely distance myself from the fact that having a personal relationship with the officer, to not believe him would be harder. . . . I think it would be a little difficult for me to separate myself from that situation that we have already had a personal relationship.

COUNSEL: Even if the law says that?

THE JUROR: Of course I would try terribly to do that because that is what the law says, but . . . it is my feeling that if two people were standing there, already had a relationship, you know, somebody is a good person, they say one thing, someone says another, that is not impartiality.

. . . .

COUNSEL: Do you think you can judge his credibility?

THE JUROR: I think I already know his credibility, which is part of the problem, to already have a set thought in your mind.

Avila didn't object to these comments, and this prospective juror was also removed for cause.

### B.     Standard of Review and Applicable Law

¶ 52     Because Avila didn't object or request any relief from the district court, we review for plain error. *Hagos v. People*, 2012 CO

25

63, ¶ 14; *People v. Marko*, 2015 COA 139, ¶ 39, *aff'd*, 2018 CO 97.

Plain error occurs where the trial court has committed an error that is obvious and substantial, and so undermines the trial's fundamental fairness as to cast serious doubt on the judgment of conviction's reliability. *Hagos*, ¶ 14.

¶ 53    A defendant is entitled to a jury verdict that is based solely on the evidence presented in the courtroom. *Dunlap v. People*, 173 P.3d 1054, 1091 (Colo. 2007). A jury's exposure to extraneous information implicates a defendant's due process right to a fair trial. *Id.* When a prospective juror makes a potentially prejudicial remark during voir dire, the trial court may issue a curative instruction, canvass the jury, or declare a mistrial. *People v. Mersman*, 148 P.3d 199, 203-04 (Colo. App. 2006). But where a defendant doesn't request a curative instruction, a trial court doesn't plainly err by failing to give one on its own. *Id.* A mistrial "is the most drastic of remedies" and "is only warranted where the prejudice to the accused is too substantial to be remedied by other means." *People v. Abbott*, 690 P.2d 1263, 1269 (Colo. 1984). Whether a prospective juror's statement is potentially prejudicial depends significantly on

the facts and circumstances. *Vititoe v. Rocky Mountain Pavement Maint., Inc.*, 2015 COA 82, ¶ 26.

### C.    *Analysis*

¶ 54    Even assuming that the prospective jurors' comments were potentially prejudicial because they vouched for the arresting officer's veracity as a trial witness, we can't conclude without more that the comments so undermined the trial's fundamental fairness as to cast serious doubt on the judgment of conviction's reliability.

¶ 55    The comments weren't so prejudicial that they required the court to order a mistrial on its own motion. *See Marko*, ¶¶ 36-38 (prospective juror's statements about defendants found not guilty by reason of insanity being quickly released didn't warrant a mistrial); *Mersman*, 148 P.3d at 204-05 (prospective juror's reference to a defense witness's involvement in the "drug scene" didn't warrant a mistrial). But Avila argues to the contrary, because the comments vouched for the credibility of the prosecution's main fact witness. Yet there's no "clear statutory command[,] . . . well-settled legal principle[,] or . . . Colorado case law" that establishes such a principle, so it wasn't so obvious that the district court should have declared a mistrial on its own motion.

*People v. Stroud*, 2014 COA 58, ¶ 33 (quoting *People v. Pollard*, 2013 COA 31M, ¶ 40).

¶ 56 We also find this case distinguishable from *Mach v. Stewart*, 137 F.3d 630, 634 (9th Cir. 1997), a case on which Avila relies. In *Mach*, the defendant was charged with sexual conduct with a minor, and during voir dire a prospective juror said that "in her experience as a social worker, children never lie[] about sexual assault." *Id.* Given that "[t]he bulk of the prosecution's case consisted of a child's testimony that [the defendant] had sexually assaulted her," the Ninth Circuit concluded that the statements "substantially affected or influenced the verdict," and reversed the conviction. *Id.* It noted that "[a]t a minimum, when [the defendant] moved for a mistrial, the court should have conducted further voir dire to determine whether the panel had in fact been infected by [the prospective juror's] expert-like statements." *Id.* at 633.

¶ 57 But because Avila didn't object or request any relief, the district court here didn't plainly err in failing to give a curative instruction or canvass the jurors on its own motion. *Mersman*, 148 P.3d at 204. And again, it wouldn't have been obvious to do so

simply because the prospective jurors' comments vouched for the prosecution's main fact witness.

¶ 58    The prospective jurors' comments vouched for a witness's veracity, similar to *Mach*, but not to the same level.  Both jurors indicated that, as the witness's friends, they believed him to be an "upstanding" or "good person," and they would be partial toward him if asked to judge his credibility versus another person's.  The court struck both jurors for cause.  This was the appropriate remedy for those jurors who indicated that they couldn't be impartial.  *Van Meter*, ¶ 14.  And their comments about their bias toward the arresting officer may have resulted in better screening of other prospective jurors.  Indeed, a third juror who said that he was biased against Avila in part by another juror's "confidence in the officer" was also struck for cause.  *See United States v. Guzman*, 450 F.3d 627, 631-33 (6th Cir. 2006) ("One of the primary purposes of voir dire is to aid counsel in their exercise of peremptory challenges," and "voir dire in front of the entire jury pool may actually result in more effective screening" because "[p]otential jurors are often emboldened to be more candid after witnessing other potential jurors' voir dire.").

29

¶ 59 Also, the "the record indicates that all who ultimately served on the jury indicated that they would be fair and impartial; the [prospective jurors] who indicated that [they] could not be impartial were dismissed for cause." *Van Meter*, ¶ 14; *Vititoe*, ¶ 31. So, Avila's "contention relies solely 'on speculation as to the effect, if any, the potential jurors' statements had on the actual jurors.'" *Vititoe*, ¶ 31 (quoting *Guzman*, 450 F.3d at 632); *see United States v. Jones*, 696 F.2d 479, 492 (7th Cir. 1982) ("Except for the . . . dismissed panel members, no juror displayed prejudice. . . . We believe that the defendant[] w[as] tried by an impartial jury.").

¶ 60 We conclude the district court didn't plainly err by not declaring a mistrial on its own motion.

## VI.  Conclusion

¶ 61 The judgment is affirmed.

JUDGE TAUBMAN and JUDGE GROVE concur.