The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
January 16, 2020

## 2020COA7

**No. 16CA0347, *People v. Knobbe* — Trials — Voir Dire; Criminal Law — Burden of Proof — Reasonable Doubt; Constitutional Law — Due Process**

Where a trial court analogized the reasonable doubt standard to decisions jurors make in their everyday lives, like choosing a doctor or buying a home, a division of the court of appeals holds for the first time that such a description constituted structural error and required automatic reversal. The description impermissibly lowered the prosecution's burden of proof and thus infringed on the defendant's due process rights.

The division also holds that the trial court erred by omitting language from its second degree kidnapping jury instruction. The division further concludes that the prosecution's evidence was sufficient to support a kidnapping conviction and that the

prosecution is not barred from retrying the defendant on that charge.  Last, the division declines to address several issues that may not arise on retrial.

The dissent would affirm, concluding that the trial court's comments were neither structural nor plain error.

COLORADO COURT OF APPEALS           **2020COA7**

---

Court of Appeals No. 16CA0347
Adams County District Court No. 14CR2817
Honorable Thomas R. Ensor, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Kyotte Kyle Knobee, a/k/a Kyotee Knobbe,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE TERRY
Pawar, J., concurs
Dailey, J., concurs in part, dissents in part

Announced January 16, 2020

---

Philip J. Weiser, Attorney General, Jacob R. Lofgren, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Meghan M. Morris, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    During voir dire in criminal trials, some judges — seemingly not trusting jurors' ability to understand and apply the standard reasonable doubt jury instruction — have imparted to prospective jurors the judges' own interpretations of the prosecution's burden of proof.  That practice is fraught with problems of constitutional magnitude, potentially impairing a defendant's fundamental right to a fair trial.  Our supreme court, in *Johnson v. People*, 2019 CO 17, and numerous divisions of this court, as noted in *People v. Tibbels*, 2019 COA 175, have repeatedly cautioned against the practice.

¶ 2    Today, we conclude that the trial court's error in giving such an interpretation to prospective jurors impermissibly lowered the burden of proof of guilt, and that we must reverse the conviction entered against defendant, Kyotte Kyle Knobee, a/k/a Kyotee Knobbe (Knobbe).

¶ 3    A jury found Knobbe guilty of second degree kidnapping involving sexual assault, second degree kidnapping with a deadly weapon, sexual assault of an at-risk victim, aggravated motor vehicle theft, and third degree assault of an at-risk victim.  We reverse and remand with directions.

1

## I.    Factual Background

¶ 4    The prosecution's evidence showed that Knobbe and the alleged victim, P.F., were in an on-again, off-again intimate relationship.  One night, Knobbe and another friend (N.W.) visited P.F. at her house.  The three of them — who are all deaf and communicate by sign language — visited for several hours before going to sleep in three different areas of the house.  The following morning, N.W. and P.F. were standing outside when Knobbe came out and asked P.F. to follow him back into the house.  When P.F. entered the kitchen, Knobbe grabbed a knife, pointed it at her, and ordered her to move into the basement, where he threw her onto a bed, choked her, and forcibly sexually assaulted her.

¶ 5    Around that time, P.F.'s parents arrived to drive her to her son's soccer game.  P.F.'s ex-husband had custody of their son, and attending the son's soccer games was an important part of P.F.'s court-ordered parenting reintegration plan.  N.W. told the parents that P.F. was inside the house.  After discovering P.F.'s truck in the garage and all the doors to the house locked, the parents drove to their own home to retrieve their keys to P.F.'s house.  When they

2

were almost home, P.F.'s mother received texts from P.F. saying "Help" and "Kyle try to kill me."  (P.F. later said she had sent the texts quickly while Knobbe was not looking.  When asked why she did not call 911, she said that because she is deaf, she would have been required to complete a video call, which would have taken a significant amount of time.)

¶ 6    Meanwhile, Knobbe forced P.F. into her truck at knifepoint and drove her around in the mountains for several hours.  At some point during the drive, Knobbe threw the knife out the window.

¶ 7    Shortly after Knobbe and P.F. left the house, P.F.'s parents returned to her house and found the garage open, the truck missing, and P.F.'s phone on her bed.  They called the police.  Eventually, Knobbe drove P.F. back to her neighborhood.  Nearing P.F.'s house, he saw a police officer outside, dropped P.F. off at the corner, and drove away.

¶ 8    P.F. went to a hospital and underwent a sexual assault nurse examination, which found injuries to her arms, chest, legs, and neck, and Knobbe's semen in her vaginal area.

¶ 9     Knobbe's theory of defense at trial was that P.F. fabricated the allegations to cover for the fact that she had used cocaine and had left with Knobbe instead of attending her son's soccer game. Knobbe testified that after N.W. went to bed the night before the incident, Knobbe and P.F. stayed up and used cocaine before having consensual sex in the basement. The next morning, P.F. came into the basement and poked him in the back with a knife, surprising him and causing him to grab her arms and choke her to get her to drop the knife. After calming down, P.F. told him that she wanted to go into the mountains. Without his knowledge, P.F. brought the knife with her, and when she pulled out the knife during the drive, he got it away from her and threw it out a window. During the drive, P.F. told him about her son's soccer game and that she was going to tell her parents that he had raped and kidnapped her.

¶ 10    The jury convicted Knobbe of the offenses mentioned above; acquitted him of a crime of violence sentence enhancement count alleged in connection with the charge of sexual assault on an at-risk victim; and could not reach a verdict on an additional charge of

4

sexual assault with a deadly weapon, which the prosecution later dismissed.

¶ 11     At sentencing, the trial court merged the two kidnapping offenses and sentenced Knobbe to an indeterminate term of sixteen years to life imprisonment in the custody of the Department of Corrections.

## II.     The Evidence Was Sufficient to Support a Kidnapping Conviction

¶ 12     Knobbe asserts that the prosecution's evidence was insufficient to prove that he was guilty of kidnapping under section 18-3-302(3)(a), C.R.S. 2019.  We address this issue first because, if the evidence were insufficient, the guarantees against double jeopardy in the United States and Colorado Constitutions would bar the prosecution from retrying Knobbe on this charge.  *See People v. Marciano*, 2014 COA 92M-2, ¶ 42.  We conclude that the evidence was sufficient to support the kidnapping conviction.

¶ 13     "When assessing the sufficiency of the evidence . . . , we review the record de novo to determine whether the evidence, viewed in the light most favorable to the prosecution, was both substantial and sufficient to support the conclusion by a reasonable mind that the

defendant was guilty beyond a reasonable doubt." *People v. Griego*, 2018 CO 5, ¶ 24.

¶ 14    According to Knobbe, the prosecution's evidence could at most be interpreted to show that he moved the victim by forcing her to be driven into the mountains *after* the sexual assault, and that subsection 302(3)(a) can be applied only where the kidnapped person is or will be sexually assaulted after being kidnapped. In support of his contention, Knobbe cites section 2-4-104, C.R.S. 2019, which states that statutory "[w]ords in the present tense include the future tense," and *Sifton v. Stewart Title Guaranty Co.*, 259 P.3d 542, 544 (Colo. App. 2011) (stating that division was unaware of any Colorado authority holding that present tense language applies to past events).

¶ 15    Section 18-3-302(3)(a) provides, "[s]econd degree kidnapping is a class 2 felony if . . . [t]he person kidnapped is a victim of a sexual offense pursuant to part 4 of this article." Nothing in the statute indicates *when* the sexual offense must be committed in relation to the kidnapping.

¶ 16    We do not resolve this timing conundrum because, as the Attorney General argues, the prosecution presented evidence at trial that Knobbe sexually assaulted the victim *after* he pulled a knife from the knife block in the kitchen, pointed the knife at her, and forcefully moved her down the stairs into a basement bedroom, where he pushed her onto a bed and sexually assaulted her. Viewing the evidence in the light most favorable to the prosecution, *People v. Davis*, 2012 COA 56, ¶ 12, we conclude that the evidence was sufficient to support a conviction for kidnapping. *See* § 18-3-302(1), (3), (4). Therefore, the prosecution is not barred from retrying Knobbe on this charge.

### III. The Court's Comments on "Reasonable Doubt" Require Reversal

¶ 17    Knobbe contends that during jury voir dire the trial court erred by making comments that trivialized the prosecution's burden of proof and his presumption of innocence. We agree and conclude that this error requires reversal.

¶ 18    During voir dire, the trial court had a discussion with potential jurors — related at greater length below — about the prosecution's burden to prove guilt beyond a reasonable doubt. For now, we

7

highlight the following discussion between the court and a prospective juror — who deliberated to a verdict — about the reasonable doubt standard.

> THE COURT: It is *a standard that we use a lot of times*, beyond a reasonable doubt, when we do important things in our lives, *like buying a home, or choosing doctors, or whatever.* Do you understand?
>
> THE JUROR: Yes, I do.
>
> THE COURT: *Can you hold the People to that burden* and not let them by on anything less, *and not require them to prove anything more*?

(Emphases added.) The juror agreed to do so. After the close of evidence, the court gave the jury a proper written instruction defining the presumption of innocence, burden of proof, and reasonable doubt, in accordance with COLJI-Crim. E:03 (2018).

## A. Standard of Review

¶ 19    In *Johnson,* our supreme court treated a district court judge's supplementary commentary to jurors about the reasonable doubt instruction as an "instruction." *See Johnson, passim.* The *Johnson* court also recognized that "[a]n instruction that lowers the prosecution's burden of proof below reasonable doubt constitutes

structural error and requires automatic reversal." *Id.* at ¶ 8 (citing *Sullivan v. Louisiana,* 508 U.S. 275, 281-82 (1993)).

## B.  Analysis

¶ 20    Knobbe asserts that the trial court's description of the reasonable doubt standard trivialized the prosecution's burden of proof by comparing the decision jurors make in a criminal case to decisions they make in their everyday lives.  We agree.

### 1.  The Reasonable Doubt Standard

¶ 21    The supreme court in *Johnson* described the reasonable doubt standard as a bedrock principle of American jurisprudence:

> In criminal cases, the prosecution is required to "prove every factual element necessary to constitute the crime charged beyond a reasonable doubt."  *Vega v. People,* 893 P.2d 107, 111 (Colo. 1995).  This requirement "dates at least from our early years as a Nation" and is nothing short of "indispensable."  *In re Winship,* 397 U.S. 358, 361, 364, (1970).  The U.S. Supreme Court has held that the Due Process Clause mandates the universal application of the reasonable doubt standard in criminal prosecutions.  *See id.* at 364 ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").  While the standard's application is universally mandated, courts retain some

flexibility in defining what constitutes a reasonable doubt. *Victor v. Nebraska,* 511 U.S. 1, 5 (1994) ("[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt . . . the Constitution does not require that any particular form of words be used . . . .").

*Id.* at ¶ 10.

¶ 22    As *Johnson* recognized, "[t]he U.S. Supreme Court has cautioned that further attempts by courts or parties to define 'reasonable doubt' do not provide clarity," *id.* at ¶ 13. *Johnson* quoted the admonition from *Victor v. Nebraska,* 511 U.S. at 22, that "trial courts must avoid defining reasonable doubt so as to lead the jury to convict on a lesser showing than due process requires." *Johnson,* ¶ 13. And it cautioned that "[a]ttempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury . . . ." *Id.* (quoting *Holland v. United States,* 348 U.S. 121, 140 (1954), in turn quoting *Miles v. United States,* 103 U.S. 304, 312 (1880)).

¶ 23    As we discuss below, in this case, the trial court's description of the reasonable doubt standard improperly added additional commentary on what "reasonable doubt" is.

### 2. The Court's Improvised Instructions Were Unlike Those in *Johnson,* and They Require Reversal

¶ 24    In *Johnson,* the improper instruction from the trial judge consisted only of the following words:

> [Y]ou would find [a defendant] guilty only if, after hearing all of that evidence, you just can't bring yourself to do it.  You just have to hesitate.  It's not there.  You can't find her guilty because the quality or quantity of evidence just doesn't let you.  That's when you've hesitated to act.

*Id.* at ¶ 4.

¶ 25    Though the supreme court concluded that the addition by the trial court in that case to the "reasonable doubt" instruction was "problematic," *id.* at ¶ 17, it declined to reverse the conviction because the trial court's addition was "too nonsensical to be understood by the jury," was given only once during voir dire, was not referenced by either party at any time, and was "flanked by the proper instruction regarding the burden of proof at the beginning and end of the trial," *id.* at ¶¶ 1, 15.

¶ 26    Here, too, the jury was given proper "reasonable doubt" instructions at the beginning and end of trial.  But unlike in *Johnson,* where the trial court gave a brief and incorrect description

11

of a legal standard, *id.* at ¶ 9, the court here went into more detail on the subject of reasonable doubt. And unlike in *Johnson,* the court's description here was not so "isolated and nonsensical," *id.*, as to overcome any concern that the jury would misapply the reasonable doubt standard. Even though *Johnson* treated instructional error on reasonable doubt as structural error, *Johnson,* ¶ 8 — meaning an error that would require automatic reversal — we follow the supreme court's lead in that case, and proceed to consider whether the instructional error would have made enough of a difference to require reversal. *See id.* at ¶¶ 9, 18. As we conclude below, unlike in *Johnson,* the court's error here requires reversal.

¶ 27 *Johnson* came after a long line of cases from across the United States recognizing the problem of trial courts attempting to redefine the reasonable doubt standard for juries. A division of this court has recognized that

> [w]ell-intentioned trial courts, seeking to provide additional clarity to prospective jurors, sometimes feel the urge to go beyond these instructions and either insert their own supplemental instructions or attempt to add "flesh to the bones" of the standard

12

> instructions by providing examples and hypotheticals. Divisions of this court have repeatedly expressed disapproval of the practice, because such instructions run the risk of confusing the jurors and may even lower the burden of proof or diminish the presumption of innocence.

*People v. Flynn*, 2019 COA 105, ¶ 42; *accord Tibbels*, ¶ 40 ("strongly discourag[ing]" trial courts' use of "everyday illustrations to explain reasonable doubt"); *People v. Camarigg*, 2017 COA 115M, ¶ 46 ("[E]quat[ing] the burden of proof to an everyday choice can be improper."); *but see People v. Avila*, 2019 COA 145, ¶¶ 42-48 (upholding conviction where trial court likened application of the "beyond a reasonable doubt" standard to the decisions one makes when buying produce and deciding whether to buy a house with a crack in the foundation).

¶ 28     Since at least 1914, Colorado appellate courts have been discouraging trial courts from creating their own formulations of reasonable doubt. *See Foster v. People*, 56 Colo. 452, 458, 139 P. 10, 12 (1914) ("[W]e [have previously] called the attention of district attorneys and trial judges, and now do so again, to the advisability of following an approved instruction on the subject of reasonable

doubt . . . , for the reason that this is the safe practice, and obviates the necessity of considering instructions on the subject differently worded."). And yet, the issue arises again and again in the court of appeals. *See Tibbels,* ¶ 33 ("[T]wenty-two decisions of this court, both published and unpublished, have repeatedly discouraged trial courts' use of illustrations to explain reasonable doubt, the presumption of innocence, and other legal concepts.").

### a. The Court's Colloquy

¶ 29 At the start of voir dire, the court announced to the jury venire that he had "about 13 points to make" and that he would make them with "the first 13" prospective jurors. Addressing each of those jurors directly, he engaged them in a colloquy about certain trial concepts, using folksy, colorful, and memorable language.

¶ 30 The judge began by describing the charges that had been lodged against Knobbe. He then moved to a description of his own interpretation of the reasonable doubt standard.

¶ 31 The judge asked a potential juror, "Are you a reasonable person?" After the juror responded, "I believe so," the judge gave the following description of the reasonable doubt standard. He

14

began with an almost verbatim quotation of part of the *actual,* legal

definition of the standard that the jurors would be given at the close

of trial (included in the first quoted paragraph, below). *See* COLJI-

Crim. E:03. The judge then went on to give his own interpretation

of the meaning of that standard:

> THE COURT: The burden of proof that the
> People have is called beyond a reasonable
> doubt. And that means a doubt that would
> cause a reasonable person to hesitate and
> pause in matters of importance to themselves.
> Do you understand?
>
> THE JUROR: Yes, I do.
>
> THE COURT: Have you ever heard the term
> beyond a shadow of a doubt?
>
> THE JUROR: Yes, I have.
>
> THE COURT: Sure. We all have. It is great
> for books. It is great for the theatre. It has
> pizzazz. Beyond a shadow of a doubt. But
> there is no such thing in any court as proof
> beyond a shadow of a doubt. Because if you
> think of that term, that means there is
> absolutely no doubt whatsoever. If life has
> taught us anything, life has taught us nothing
> we do as human beings can be proven beyond
> a shadow of a doubt. Anything can happen.
> We don't run our lives that way, but anything
> could happen. We could have an earthquake
> in Brighton, Colorado. Fracking. I don't know.
> But I am not worried about it.

Whoever would have thought somebody could land a jet airliner in the middle of the Hudson River and nobody gets hurt? But it happened. But we don't base our lives on those things.

I don't know how best to explain it. *It is a standard that we use a lot of times, beyond a reasonable doubt*, when we do important things in our lives, *like buying a home, or choosing doctors, or whatever.* Do you understand?

THE JUROR: Yes, I do.

THE COURT: *Can you hold the People to that burden* and not let them by on anything less, *and not require them to prove anything more*?

THE JUROR: Yes, Your Honor, I can do that.

(Emphases added.)

¶ 32 After extracting this promise from the juror, the judge went on to discuss his view of other trial concepts with prospective jurors.

b.     Discussion

¶ 33 A jury can only fulfill its constitutional role of finding each element of a charged offense beyond a reasonable doubt when it has been properly instructed. *Griego v. People*, 19 P.3d 1, 7 (Colo. 2001). "[I]f the trial court properly instructed the jury on the law — even with 'objectionable language . . . [in] the trial court's

16

elaboration of the reasonable doubt instruction' — then there is no violation of due process." *Johnson*, ¶ 14 (quoting *People v. Sherman*, 45 P.3d 774, 779 (Colo. App. 2001)).

¶ 34    We conclude that the trial court improperly instructed the jury on the reasonable doubt standard, and that, for the following four reasons, reversal of Knobbe's conviction is required.

¶ 35    *First*, the court's improvised description of the standard was an incorrect statement of the law that lowered the prosecution's burden of proof. *See Tibbels*, ¶ 33 ("Because the prosecution has the burden of proving every charge beyond a reasonable doubt, any instruction on reasonable doubt that lowers this burden of proof violates a defendant's constitutional right to due process.").

¶ 36    As the judge initially — correctly — told the jurors, a "reasonable doubt" is "a doubt that would cause a reasonable person to hesitate and pause in matters of importance to themselves." *See* COLJI-Crim. E:03; *People v. Robb*, 215 P.3d 1253, 1262-63 (Colo. App. 2009) (upholding this part of the reasonable doubt instruction).

¶ 37    We see nothing wrong with the court's attempt to distinguish the "beyond a reasonable doubt" standard from the "beyond a shadow of a doubt" phrase, popularized in television courtroom dramas.

¶ 38    But the court then told the jurors that the reasonable doubt standard for criminal convictions is "a standard that we use a lot of times," which is simply untrue; and by telling jurors that their decision is no more consequential than choosing a doctor "or whatever," the court improperly trivialized the prosecution's burden of proof.

¶ 39    Few decisions that people make have the gravity of deciding whether to convict an accused person of a crime. *See Robb*, 215 P.3d at 1262-63 (trial courts should emphasize "the kind of doubt that would make a person hesitate to act, rather than the kind on which he would be willing to act" (quoting *Holland*, 348 U.S. at 140)); *Commonwealth v. Ferreira*, 364 N.E.2d 1264, 1273 (Mass. 1977) ("[A]ll references to examples taken from the jurors' lives should be avoided. . . . The degree of certainty required to convict is unique to the criminal law. We do not think that people

customarily make private decisions according to this standard nor may it even be possible to do so."); *see also, State v. Walker*, 265 P.3d 191, 196 (Wash. Ct. App. 2011) (prosecutor erroneously described the reasonable doubt standard as "a common standard that you apply every day" and compared it to having surgery and leaving children with a babysitter); *cf. People v. Van Meter*, 2018 COA 13, ¶ 32 (concluding that prosecutor's description of beyond a reasonable doubt standard using analogy to partially completed jigsaw puzzle with image of space shuttle was improper, but it did not amount to reversible plain error because, without the guidance provided in that judicial decision, impropriety of use of the analogy was not "so clear-cut that a trial judge should have been expected to avoid it without benefit of an objection" (quoting *People v. Carter*, 2015 COA 24M-2, ¶ 58)); *Camarigg*, ¶ 50 (concluding that a prosecutor's use of an analogy to filling in a jigsaw puzzle did not improperly quantify or trivialize the State's burden to prove the defendant's guilt beyond a reasonable doubt).

¶ 40　　Because determining an accused person's guilt beyond a reasonable doubt is such an extraordinary occurrence, subject to

19

an unusually stringent burden, we respectfully disagree with the division in *Avila*, ¶¶ 42-48, that it was not error for a trial court to liken the "beyond a reasonable doubt" standard to the decision one makes when buying produce. *See Tibbels*, ¶ 34 (noting that "the risk of lessening the burden of proof increases when analogies to everyday experiences are used to explain the concept of reasonable doubt" (citing *Victor*, 511 U.S. at 24 (Ginsburg, J., concurring in part and concurring in the judgment))).

¶ 41    *Second*, the judge's commentary was part of a lengthy, highly emphasized, Socratic colloquy with individual prospective jurors. It cannot have failed to color the jurors' perceptions of the prosecution's burden. Thus, it is distinct from the "isolated" comment that deterred the supreme court from reversing the conviction in *Johnson*, ¶ 9.

¶ 42    *Third*, the judge's commentary came at the beginning of trial, when prospective jurors were forming their first impressions of the case and of the task on which they were about to embark. We cannot conclude that jurors would have paid less heed to commentary on an issue as critical as "reasonable doubt" simply

because it was made at the beginning of trial, rather than at the end, when the jury was formally given the written instructions. *Cf. Deleon v. People*, 2019 CO 85 (reversing conviction because trial court failed to give a no-adverse-inference instruction about the defendant's right to remain silent, as the defendant had requested, during final charge to jury).

¶ 43 Case law has relied on the principles of primacy and recency and their effect on memory and perception, and has recognized that those principles can be considered in determining whether to reverse a criminal conviction. *See Domingo-Gomez v. People*, 125 P.3d 1043, 1052 (Colo. 2005) ("Rebuttal closing is the last thing a juror hears from counsel before deliberating, and it is therefore foremost in their thoughts."); *People v. Robinson*, 2017 COA 128M, ¶ 36 ("[W]e . . . recognize, as have numerous scientists and academics, that principles of primacy may cause statements and arguments made early in a trial to have a disproportionately influential weight." (first citing L. Timothy Perrin, *From O.J. to McVeigh: The Use of Argument in the Opening Statement*, 48 Emory L.J. 107, 124 (1999); then citing John B. Mitchell, *Why Should the*

*Prosecutor Get the Last Word?*, 27 Am. J. Crim. L. 139, 157-58 (2000))), *rev'd*, 2019 CO 102; *Dudley v. State*, 951 P.2d 1176, 1180 (Wyo. 1998) ("[W]e recognize[] the accepted psychological impact of the testimony of witnesses presented first or last under the theory of 'primacy and recency.'" (quoting *Whiteplume v. State*, 841 P.2d 1332, 1340 (Wyo. 1992))).

¶ 44    Thus, the fact that the judge's description of the "beyond a reasonable doubt" standard came so early in the trial made it *more* likely that it would be memorable when it came time for the jury to apply the standard during deliberations.

¶ 45    And *fourth*, the court made a point of extracting a commitment from the juror to "hold the People to [the] burden" as the court had just described it — namely, "a standard that we use a lot of times . . . when we do important things in our lives, *like buying a home, or choosing doctors, or whatever.*"  (Emphasis added.)  As we have discussed above, the court's description of the burden was *not* the exacting standard required by law.  The choice of a doctor "or whatever" certainly does not have the same gravity as the decision about guilt beyond a reasonable doubt.

22

¶ 46    Though the court extracted a promise from just one potential juror to hold the prosecution *only* to the burden as the court described it, this promise could not have failed to impress the judge's defined standard on other jurors.  And the juror who gave the promise to the court ultimately sat on the jury and deliberated to a verdict.

¶ 47    Jurors look to trial court judges as authoritative sources of the law, and usually, such confidence is properly placed.  Given that the trial judge's description of "reasonable doubt" was part of a lengthy and highly emphasized presentation to prospective jurors, it could have encouraged all of the jurors to rely on the judge's incorrect interpretation of the law.

¶ 48    Therefore, unlike the trial court's discussion of reasonable doubt in *Johnson*, the judge's description here was not so "isolated and nonsensical," *Johnson*, ¶ 9, as to overcome any concern that the jury would misapply the reasonable doubt standard.  The trial court's comments here were not isolated, and though incorrect, we cannot describe them as "nonsensical."

¶ 49 The judge's extraction of the juror's promise to apply the burden of proof as the judge incorrectly described it renders this case distinct from cases where appellate courts have declined to reverse convictions. And the court's analogies to reasonable doubt here were more nebulous (buying a home, choosing doctors, "or whatever") than those in *Flynn* and *Tibbels*, which were not found to require reversal. *See Tibbels*, ¶¶ 24-26 (likening reasonable doubt to whether one would hesitate to buy a house that has a "structurally significant" crack in the foundation); *Flynn*, ¶¶ 35-38 (likening reasonable doubt to whether one could doubt if the courthouse would "stand for another 24 hours [even though there might be visible] cracks . . . in the foundation" and whether a juror's mother might have gotten the juror's date of birth wrong).

3. The Giving of a Proper Jury Instruction at the Close of Trial Did Not Cure the Court's Error

¶ 50 Even though, after three days of trial, the court provided the jury with a proper reasonable doubt jury instruction under COLJI-Crim. E:03, and told the jury that those instructions "contain the rules of law that you must apply to reach your verdict," we conclude that the damage had already been done during voir dire, as

24

discussed above, by the trial court's lessening of the prosecution's burden of proof.

¶ 51 The jurors' review, during deliberations, of the more formal language of the pattern "beyond a reasonable doubt" jury instruction would not have been sufficient to dislodge the judge's memorable and implanted notion of the incorrect standard.

¶ 52 We conclude that this is so even though, before reading the stock jury instructions, the court told the jurors, "you must all follow the instructions *as I give them to you*" (emphasis added). Instead of vitiating the court's error, this language reinforced that the judge himself was the authority on the law. In fact, the judge said, "It is *my job to decide what rules of law apply to this case*" (emphasis added), and jurors would have had no way of discerning stock jury instructions from those improperly described by the judge during voir dire. *Cf. Flynn*, ¶ 49 (trial court's improper hypotheticals discussing reasonable doubt standard did not lower the burden of proof and did not constitute reversible error where "each of the hypotheticals here was discussed verbally, and only once"; none was mentioned again at any time during the

25

proceedings; the trial court read the correct definitions of beyond a reasonable doubt and presumption of innocence contemporaneously with the discussions; the court "repeatedly referred back to the appropriate standard definition of reasonable doubt"; and the correct instructions were again read to the jury after the close of evidence).

¶ 53   We note that, about eight months before Knobbe's trial, this same trial court judge had been advised in remand instructions in an opinion from a division of this court not to analogize the concept of reasonable doubt "to decisions people make in their everyday lives" because "[s]uch analogies run the risk of impermissibly trivializing the jury's task in determining [the] defendant's guilt." *People v. Mortensen,* slip op. at 12 (Colo. App. No. 12CA1096, Feb. 19, 2015) (not published pursuant to C.A.R. 35(f)).

¶ 54   Because, in this case, the court's improper description of the standard of proof lowered the prosecution's burden of proving guilt, we conclude that the error was a structural error that requires reversal of the conviction.  *See Johnson,* ¶ 8; *see also People v. Kanan,* 186 Colo. 255, 259, 526 P.2d 1339, 1341 (1974) ("Prejudice

to the defendant is inevitable when the court instructs the jury in such a way as to reduce the prosecution's obligation to prove each element of its case beyond a reasonable doubt."); *People v. Owens*, 97 P.3d 227, 237-38 (Colo. App. 2004) (The court's erroneous revised instruction "effectively reduced the prosecution's burden of proof and permitted the jury to find the asportation element of second degree kidnapping based on legally insufficient grounds.").

¶ 55    *Deleon* does not change the result we reach here.  In *Deleon*, the supreme court addressed a trial court's failure to properly instruct a jury on a defendant's right to remain silent.  There, the supreme court held that, because a trial court improperly failed at the close of trial to give a jury instruction on the defendant's right to remain silent (i.e., not to testify), the error required reversal, even though, during jury voir dire, the court and counsel had properly emphasized that right.  *Deleon*, ¶ 15.

¶ 56    True, in that case, the supreme court emphasized the importance of *final* jury instructions in ensuring a fair trial to a defendant, even though a proper instruction had been given during jury voir dire in that case.  *Id.* at ¶ 27.  But that explanation does

27

not convince us that the giving of a proper final reasonable doubt instruction in Knobbe's case vitiates the error in the trial court's initial instructions as to the meaning of "reasonable doubt." The court in *Deleon* did not create an excuse for giving improper instructions during the jury voir dire phase of trial.

¶ 57 And, in *Deleon*, the supreme court said that the purpose of the trial court's comment during voir dire about the defendant's right not to testify "was to determine whether the potential jurors could act impartially and conscientiously apply the law, *not to instruct the jury on the law itself*." *Id.* at ¶ 26 (emphasis added). As discussed above, we are convinced that the judge here *was* trying to instruct the jury during voir dire "on the law itself" — and improperly so.

¶ 58 Importantly, unlike in *Deleon*, in this case, a juror who deliberated to verdict had agreed to be bound by the incorrect burden of proof as described by the judge.

## IV. Presumption of Innocence

¶ 59 Defendant also argues that the trial court erred when, addressing jurors at the start of voir dire, the court gave its own interpretation of the presumption of innocence. Because we are

28

reversing the conviction based on the trial court's improper description of the burden of proof, we need not address its description of the presumption of innocence. We say only that, as with the description of the burden of proof, it is not within the trial court's purview to redefine the presumption of innocence for jurors.

## V. The Court's Instruction Addressing Kidnapping By Use of a Deadly Weapon

¶ 60 The prosecution charged Knobbe with second degree kidnapping under section 18-3-302(4)(a)(II) and (III). Knobbe argues that the court's jury instruction failed to track the statutory language of subsections (II) and (III) because it omitted mention that, to convict him of kidnapping with a deadly weapon, the kidnapping had to be "accomplished by" the use of a deadly weapon. We agree.

¶ 61 Second degree kidnapping is elevated to a class 3 felony if "[t]he kidnapping *is accomplished by the use* of a deadly weapon or any article used or fashioned in a manner to cause a person to reasonably believe that the article is a deadly weapon" or "[t]he kidnapping *is accomplished by* the perpetrator representing verbally

29

or otherwise that he or she is armed with a deadly weapon."
§ 18-3-302(4)(a)(II), (III) (emphases added).

¶ 62 An element of a sentencing enhancement, like a criminal offense, has to be proved to a jury beyond a reasonable doubt. *See People v. Jamison*, 220 P.3d 992, 995 (Colo. App. 2009). If, on retrial, the court again instructs the jury on this charge, it must instruct the jury that, to convict of this charge, the jury has to find that the kidnapping was "accomplished by" the use of a deadly weapon.

## VI. Sex Offender Lifetime Supervision Act

¶ 63 Knobbe was sentenced under the Colorado Sex Offender Lifetime Supervision Act of 1998, sections 18-1.3-1001 to -1012, C.R.S. 2013. On appeal, he contends that the Act is unconstitutional. We see no reason to depart from the well-reasoned decisions of other divisions of this court that have consistently upheld the constitutionality of the Act. *See, e.g., People v. Sabell*, 2018 COA 85, ¶ 47; *People v. Relaford*, 2016 COA 99, ¶ 72; *People v. Torrez*, 2013 COA 37, ¶ 88; *People v. Collins*, 250 P.3d 668, 679 (Colo. App. 2010); *People v. Villa*, 240 P.3d 343, 359

(Colo. App. 2009); *People v. Firth,* 205 P.3d 445, 452 (Colo. App. 2008); *People v. Lehmkuhl,* 117 P.3d 98, 108 (Colo. App. 2004); *People v. Dash,* 104 P.3d 286, 290-92 (Colo. App. 2004); *People v. Oglethorpe,* 87 P.3d 129, 133-36 (Colo. App. 2003); *People v. Strean,* 74 P.3d 387, 393-95 (Colo. App. 2002).

## VII.   Issues Not Addressed Because They May Not Arise on Retrial

### A.    Jury Instruction on Sexual Assault Sentence Enhancer to Kidnapping Charge

¶ 64     Knobbe asserts that the trial court incorrectly instructed the jury regarding the sexual assault sentence enhancer to the kidnapping offense.  *See* § 18-3-302(3)(a) (providing that second degree kidnapping is a class 2 felony if the person kidnapped is a victim of a sexual offense pursuant to sections 18-3-401 to -418, C.R.S. 2019).  According to Knobbe, the court's instructions allowed the jury to find applicability of the sexual assault sentence enhancer to second degree kidnapping "even if the sexual assault occurred before the kidnapping began."  He asserts that the prosecution's theory at trial was that Knobbe first sexually assaulted the victim and then kidnapped her by driving her into the mountains.

31

¶ 65 Because we cannot anticipate whether the prosecution will advance a theory on retrial that this section applies merely because the victim was a victim of sexual assault, or whether it will, instead, advance a theory that the kidnapping preceded the sexual assault, we decline to address this argument.

B. Sentencing for Kidnapping Involving Sexual Assault and Crime of Violence Sentence Enhancement

¶ 66 Knobbe asserts errors in the court's sentencing decisions. Because we cannot tell whether the asserted sentencing errors will arise on retrial, and if so, whether they will arise in the same context, we decline to address them.

## VIII. Conclusion

¶ 67 The judgment is reversed, and the case is remanded for a new trial.

JUDGE PAWAR concurs.

JUDGE DAILEY concurs in part and dissents in part.

JUDGE DAILEY, concurring in part, dissenting in part.

¶ 68    I dissent from the majority's conclusion that the trial court's comments in voir dire constituted structural error requiring reversal.

¶ 69    The majority holds that two of the court's comments improperly trivialized the reasonable doubt standard. The two comments were:

> I don't know how best to explain it. *It is a standard that we use a lot of times, beyond a reasonable doubt, when we do important things in our lives, like buying a home, or choosing doctors, or whatever.* Do you understand?
>
> THE JUROR: Yes, I do.
>
> THE COURT: *Can you hold the People to that burden and not let them by on anything less, and not require them to prove anything more?*
>
> THE JUROR: Yes, Your Honor, I can do that.

(Emphases added.)

¶ 70    The comments were not given to the jury in writing.

¶ 71    I agree that the comments quoted above were problematic: the first because it trivialized the reasonable doubt standard, and the second not because it independently trivialized the standard but only because it could be perceived as incorporating the contents of

33

the first comment. *See People v. Tibbels*, 2019 COA 175, ¶ 34

("[T]he risk of lessening the burden of proof increases when

analogies to everyday experiences are used to explain the concept of

reasonable doubt[.]"); *see also Tou Fue Yang v. State*, No. A-11787,

2017 WL 838809, at *3 (Alaska Ct. App. Mar. 1, 2017) (unpublished

opinion) ("We have previously cautioned against using these types

of 'daily-life' analogies . . . , noting the general disapproval of such

analogies across various jurisdictions and the uniform concern that

such analogies often act to minimize the State's burden of proof.");

*People v. Johnson*, 9 Cal. Rptr. 3d 781, 783 (Cal. Ct. App. 2004)

("We are not prepared to say that people planning vacations or

scheduling flights engage in a deliberative process to the depth

required of jurors or that such people finalize their plans only after

persuading themselves that they have an abiding conviction of the

wisdom of the endeavor. Nor can we say that people make such

decisions while aware of the concept of 'beyond a reasonable

doubt.'"); *Holmes v. State*, 972 P.2d 337, 343 (Nev. 1998)

("[C]ommentary analogizing reasonable doubt with major life

decisions such as buying a house or changing jobs is improper

34

because these decisions involve elements of uncertainty and risk-taking and are wholly unlike the kinds of decisions that jurors must make in criminal trials.").

¶ 72    But I do not agree that those comments constituted an "instruction" that, under *Sullivan v. Louisiana*, 508 U.S. 275 (1993), could constitute structural error requiring automatic reversal.  In my view, a court's comments during voir dire are much less formal than — and, consequently, do not attain a similar status to — specific instructions by the court as to the applicable law.  *See Tibbels*, ¶ 36 ("[T]he illustration was unlike a formal instruction of law."); *People v. Flynn*, 2019 COA 105, ¶ 44 n.5 ("We do not believe that every comment made by a trial court to the jury panel during voir dire is automatically an instruction."); *People v. Boyd*, 2015 COA 109, ¶ 12 (opining that the court's comments during voir dire discussions were not an instruction), *aff'd*, 2017 CO 2; *cf. People v. Medina*, 906 P.2d 2, 30–31 (Cal. 1995) ("[E]rrors or misconduct occurring during jury voir dire, prior to the introduction of evidence

or the giving of formal instructions, are far less likely to have prejudiced the defendant.").[1]

¶ 73    The majority, of course, takes a different view.  It relies on *Johnson v. People*, 2019 CO 17, ¶ 7, where the supreme court, without explanation, treated a trial court's voir dire comments about the "hesitate to act" part of the reasonable doubt standard as an instruction.  The supreme court did not, however, have to determine the character of the court's comments, inasmuch as it concluded that the particular comments would not have misled the jury anyway.  *Id.* at ¶ 9.

¶ 74    More telling than *Johnson,* I think, is the supreme court's more recent decision in *Deleon v. People*, 2019 CO 85.  In *Deleon,* the supreme court reversed a defendant's conviction because the trial court never instructed the jury, as it indicated it would, at the close of the evidence that the jury could not draw an adverse inference from the defendant's failure to testify.  *Id.* at ¶ 29.  The court had told the jury this during voir dire.  *Id.* at ¶ 4.  But the

---

[1] That the court's comments were not meant as instructions is reflected in the ambivalent (i.e., "I don't know how best to explain it") manner in which it began its remarks.

36

supreme court took great pains to explain why the trial court's voir

dire comments *did not* constitute an instruction:

> [T]hey were given during the early stages of the trial process; they were made with the purpose of determining potential juror mindset; they indicated that the jury would receive further instructions later in the trial; and when the instructions were read prior to closing arguments, the jury was told by the judge that the instructions were the law they must follow.

*Id.* at ¶ 15.

Elucidating further, the court said:

> [T]he trial court's initial remarks failed to constitute an effective instruction based on both their timing and their content. To be sure, the trial court did state that [the defendant] had "no obligation to present any evidence or testimony at all. [He] does not have to testify. And if he chooses not to testify, you cannot hold it against him in any way that he did not." But it made that comment during voir dire. That is, the purpose of the comment was to determine whether the potential jurors could act impartially and conscientiously apply the law, not to instruct the jury on the law itself. . . .

> Additionally, the content of the trial court's statements was not definitive. Before opening statements, the trial court told the jury that "[a]ll the evidence and law that you will have to decide the case *will be* presented to you . . . That evidence and the Court's instructions

should be the only basis for your verdict." (Emphasis added.) Then, near the end of trial, the trial court told the jury that "[the court] will now instruct you on the law which you must apply in order to reach your verdict. . . . You must follow all of the rules as I explain them to you.". . . In sum, the trial court told the jury that it would eventually explain the law that the jury must apply, but the court then failed to instruct the jury about the law regarding the right to remain silent.

*Id.* at ¶¶ 26-27 (footnote omitted).

¶ 75      So, the supreme court in *Johnson*, without discussion, labeled voir dire comments by a judge as an instruction, but in *DeLeon*, after considerable discussion, it rejected that same label for the same type of comments. Because, to me, *DeLeon* (due to its discussion) is the more persuasive of the two, I conclude (consistent with other decisions of this court, cited earlier) that the court's voir dire comments did not constitute an "instruction" subject to structural error review.

¶ 76      Indeed, another division of this court has explicitly rejected "structural error" analysis in connection with a trial court's "assume[d]" improper use of a reasonable doubt analogy during voir dire. *People v. Baca*, 2015 COA 153, ¶¶ 11-13. And, like other

divisions of this court, I would analyze the impact of Knobbe's unpreserved claim of error under a plain error standard of review. *See id.* at ¶ 12; *see also Flynn,* ¶ 39; *People v. Carter,* 2015 COA 24M-2, ¶¶ 50-51 (applying plain error review to "jigsaw puzzle" comments made by the prosecutor and court during voir dire).

¶ 77　To qualify as plain error, an error must be both "obvious and substantial." *Hagos v. People,* 2012 CO 63, ¶ 14.　For plain error purposes, an error is "obvious" if it contravenes (1) a clear statutory command; (2) a well-settled legal principle; or (3) Colorado case law. *Scott v. People,* 2017 CO 16, ¶ 16.　For plain error purposes, an error is "substantial" if it is "seriously prejudicial" — that is, if it so undermines the fundamental fairness of the trial as to cast serious doubt on the reliability of the defendant's conviction.　*People v. Ujaama,* 2012 COA 36, ¶ 43; *see also Hagos,* ¶ 14.

¶ 78　I assume, for purposes of this appeal, that the court's error was "obvious."[2]　The error was not, however, "substantial."

---

[2] I do so without determining whether "obviousness" of error is measured as of the time of trial or the time of appeal, *see Henderson v. United States,* 568 U.S. 266 (2013) (majority measured it as of the time of appeal; three-member dissent would measure it as of the time of trial).　Even though there was no published

¶ 79    The court's two comments were made in the midst of a lengthy (i.e., approximately thirty-five-transcript-page) colloquy the court had with prospective jurors covering a number of topics, to wit: (1) the specific charges in the case; (2) decisions are to be based on nothing but the evidence and the law; (3) a defendant's presumption of innocence; (4) the prosecution always has the burden of proof; (5) sentencing is for the court, not the jury, to decide; (6) the prosecution's "beyond a reasonable doubt" burden of proof; (7) the judge determines the law, the jury the facts; (8) jurors should not be concerned with what happens at bench conferences; (9) witness credibility is for the jury to determine; (10) a trial is not a contest between attorneys; (11) judging guilt or innocence is not

---

Colorado case as of the time of trial specifically holding comments of the type made here improper, published Colorado cases had recognized the potential impropriety of similar comments, *see People v. Marko*, 2015 COA 139, ¶¶ 208-11 (no plain error in prosecution's analogizing reasonable doubt to people's decisions to drive vehicles), *aff'd*, 2018 CO 97; *People v. Cevallos-Acosta*, 140 P.3d 116, 123 (Colo. App. 2005) (no plain error in prosecution's use of analogy to "important decisions such as buying a house" to explain reasonable doubt), and courts from other jurisdictions had uniformly held such comments improper. *See People v. Pollard*, 2013 COA 31M, ¶ 41 & n.3 (considering such circumstances in determining the "obviousness" of error).

the same as judging the person; and (12) the jurors must take and apply the law as given to them — "word for word" — "in the instructions of law that it would receive at the end of the case."

¶ 80     I "acknowledge the possibility that the jury might have viewed the concept of reasonable doubt through the lens of the court's . . . illustration[s]." *Tibbels*, ¶ 35. But "[s]peculation does not suffice to demonstrate plain error." *Ujaama*, ¶ 62 (quoting *State v. Clinkscale*, 911 N.E.2d 862, 870 (Ohio 2009)); *see Jones v. United States*, 527 U.S. 373, 394-95 (1999) ("Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights.").

¶ 81     Relying on the concept of "primacy," the majority asserts that it is "*more* likely" that the jury erroneously evaluated the reasonable doubt standard in light of the examples mentioned by the court because those examples "came so early" in the trial. *Supra* ¶ 45.

¶ 82     The majority, however, overlooks, four things: (1) the judge's comments on the reasonable doubt standard were not the first, second, third, fourth, or even fifth matter mentioned in the court's

41

lengthy colloquy; (2) over three days of intervening events at trial[3]

passed between the court's comments and the time the court

formally and properly instructed the jury verbally and in writing at

the end of the case; (3) the primacy effect, upon which the majority

relies, "is often contradicted by the 'recency effect,' which states

that people will remember, and be influenced by, the last

information to which they are exposed," Kathryn M. Stanchi, *The*

*Power of Priming in Legal Advocacy: Using the Science of First*

*Impressions to Persuade the Reader*, 89 Or. L. Rev. 305, 346

(2010);[4] and (4) the last information to which the jury was exposed

regarding the definition of reasonable doubt was the proper oral

and written instructions of the court.  Under these circumstances,

---

[3] E.g., voir dire by counsel, opening statements, and presentation of evidence by both the prosecution and defense.

[4] In fact, "[i]n the jury trial context, interestingly, recency seems to be far more influential, and studies suggest that trial lawyers for both sides should present their material in a climactic order with the most important material at the end."  Kathryn M. Stanchi, *The Power of Priming in Legal Advocacy: Using the Science of First Impressions to Persuade the Reader*, 89 Or. L. Rev. 305, 347 (2010); *cf. Domingo-Gomez v. People*, 125 P.3d 1043, 1052 (Colo. 2005) (rebuttal closing "foremost" in jurors' minds because it is the last thing they hear).

it is purely speculative to infer that the court's brief and isolated voir dire comments on reasonable doubt likely so infected the jury's mindset that it was unable to properly apply the reasonable doubt standard.

¶ 83     If "[i]n the context of the entire record . . . the trial court properly instructed the jury on the law — even with 'objectionable language . . . [in] the trial court's elaboration of the reasonable doubt instruction' — then there is no violation of due process." *Johnson*, ¶ 14 (quoting *People v. Sherman*, 45 P.3d 774, 779 (Colo. App. 2001)). Thus, when the trial court uses an illustration to explain the concept of reasonable doubt, we consider the illustration's nature, scope, and timing in determining whether its use violated due process. *See People v. Villa*, 240 P.3d 343, 357 (Colo. App. 2009).

¶ 84     Here, the court's comments were made in voir dire; they were brief and but a small part of an otherwise lengthy colloquy covering numerous topics; they were made not at the outset nor at the end of that colloquy, but somewhere near the middle of it; insofar as I can determine, they were no more emphasized than any other part of

43

the lengthy colloquy; neither the trial court nor the prosecutor referenced the erroneous remarks again; the court gave the jury the proper instruction on the reasonable doubt standard, in accordance with the Model Jury Instructions, orally and in writing, before deliberations; and, in the absence of evidence to the contrary, we ordinarily presume the jury followed the court's instruction.

¶ 85    Under the circumstances, there is not, in my view, a reasonable likelihood that the jurors selected for trial misapplied the reasonable doubt standard,[5] and the court's comments neither jeopardized the fairness of the trial nor cast serious doubt on the reliability of the verdict.  Consequently, no error — plain or otherwise — requiring reversal occurred here.  *See Johnson*, ¶ 18 ("We note that the trial court provided the [contested] instruction to the jury verbally and only once.  It was not mentioned or referenced again throughout the entirety of the proceedings, including closing

---

[5] This "reasonable likelihood that the jury applied the contested instruction in an unconstitutional manner" test was utilized by the supreme court in *Johnson v. People*, 2019 CO 17, to determine whether the court's comments on the "hesitate to act" part of the reasonable doubt instruction lowered the prosecution's burden of proof in violation of due process.  *Id.* at ¶¶ 14-15.

arguments."); *Baca*, ¶¶ 13-14 (concluding that no plain error occurred in part because the improper comments were "isolated," and the court twice read the proper reasonable doubt instruction to the jury and provided it with a written copy); *People v. Estes*, 2012 COA 41, ¶ 12 (finding the risk of prejudice from improper comments during voir dire was "mitigated by the court's written jury instructions and other statements correctly explaining the applicable burdens").

¶ 86　　Because the court's comments "trivializing" the reasonable doubt standard during voir dire are not on par with a "defective" instruction defining reasonable doubt, and because, under the circumstances, the court's comments were not plainly erroneous, I would affirm Knobbe's judgment of conviction.