The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
June 10, 2021

## 2021COA80

**No. 17CA1910, *People v. Garcia* — Criminal Law — Jury Instructions — Universal Malice; Crimes — Murder in the First Degree — Extreme Indifference**

Addressing a novel issue, a division of the court of appeals
concludes that a trial court is not required to give a jury instruction
defining "universal malice" in a trial dealing with extreme indifference
murder. Because the division also rejects the defendant's other
challenges to his convictions, the division affirms the judgment.

Court of Appeals No. 17CA1910
Adams County District Court No. 16CR2539
Honorable Donald S. Quick, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Cristobal Fernando Garcia,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE NAVARRO
Hawthorne*, J., concurs
Terry, J., specially concurs

Announced June 10, 2021

Philip J. Weiser, Attorney General, Erin K. Grundy, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Britta Kruse, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2020.

¶ 1    Defendant, Cristobal Fernando Garcia, appeals the judgment of conviction entered on jury verdicts finding him guilty of attempted extreme indifference murder and reckless endangerment. Addressing a novel issue, we conclude that a trial court is not required to give a jury instruction defining "universal malice" in a trial dealing with extreme indifference murder. We also conclude that (1) the trial court's descriptions of reasonable doubt, considered as a whole, did not lower the prosecution's burden of proof; and (2) the prosecutor did not commit reversible misconduct. Therefore, we affirm.

## I.    Factual and Procedural History

¶ 2    One night, Natalie Duran asked her sister for help searching for Garcia, Duran's live-in boyfriend with whom she has children. The sisters searched bars and clubs before spotting Garcia driving a car that Duran owned. Duran followed him until he stopped.

¶ 3    Duran got out of the car she was driving, walked up to Garcia, and argued with him. As Duran started walking back toward her sister, she told Garcia that she had reported her car stolen. Garcia yelled back, "what"; aimed a handgun either at or above Duran and

1

her sister; and fired three times before running away. None of the bullets hit the women.

¶ 4 The prosecution charged Garcia with three counts of attempted first degree murder — one count on a theory of intent after deliberation (regarding Duran) and two counts on a theory of extreme indifference (regarding Duran and her sister). Each act was charged as a crime of violence, and the complaint and information was captioned "domestic violence."

¶ 5 The case was tried to a jury. As to each count, the jury was instructed on the lesser included offense of reckless endangerment. The jury convicted Garcia of one count of attempted extreme indifference murder (regarding Duran) and found that he had used, possessed, or threatened to use a deadly weapon when committing that offense. For the other two counts, the jury acquitted Garcia of attempted murder but convicted him of reckless endangerment. (His conviction for reckless endangerment as to Duran was later merged into his conviction for attempted extreme indifference murder.)

## II.  "Universal Malice" Instruction

¶ 6     We first reject Garcia's contention that the trial court erred by declining to give a jury instruction defining "universal malice."

### A.  Additional Facts

¶ 7     In addition to giving an instruction on criminal attempt, the court instructed the jury on the elements of extreme indifference murder as follows:

> 1. That Cristobal Garcia
>
> 2. in the State of Colorado, at or about the date and place charged,
>
> 3. under circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally,
>
> 4. knowingly,
>
> 5. engaged in conduct which created a grave risk of death to, [sic] persons other than himself and thereby,
>
> 6. knowingly caused the death of Natalie Duran.

This instruction tracked the applicable statute.  *See* § 18-3-102(1)(d), C.R.S. 2020.

¶ 8     Defense counsel tendered an additional instruction, which read, "'Universal Malice' is that depravity of the human heart which determines to take life upon slight or insufficient provocation, without knowing or caring who may be the victim." The court decided against giving this proposed instruction, ruling that the elemental instruction "is a sufficient explanation as to what extreme indifference means."

B.     Standard of Review and General Principles

¶ 9     We review de novo whether the jury instructions adequately informed the jury of the governing law, *Riley v. People*, 266 P.3d 1089, 1092 (Colo. 2011), but a trial court has substantial discretion to formulate instructions if they are correct statements of the law and adequately cover the issues presented, *People v. Payne*, 2019 COA 167, ¶ 16. Therefore, we review for an abuse of discretion a trial court's decision to give, or not to give, a particular jury instruction. *Id.* A trial court does not abuse its discretion unless its decision was manifestly arbitrary, unreasonable, or unfair, or was based on an erroneous understanding of the law. *People v. Esparza-Treto*, 282 P.3d 471, 480 (Colo. App. 2011).

¶ 10     Instructions that accurately track the language of the applicable statute are generally sufficient. *People v. Gallegos*, 260 P.3d 15, 26 (Colo. App. 2010). Ordinarily, words and phrases in a statute should be "read in context and construed according to the rules of grammar and common usage." § 2-4-101, C.R.S. 2020. Words and phrases "that have acquired a technical or particular meaning, whether by legislative definition or otherwise," must be defined for the jury accordingly. *Id.*; *Griego v. People*, 19 P.3d 1, 7 (Colo. 2001). Conversely, a definitional instruction is not required for a term or phrase familiar to a reasonable person of common intelligence, especially when the term's meaning is not so technical or mysterious as to create confusion in jurors' minds. *Payne*, ¶ 18. "When a jury indicates no confusion about the meaning of a statutory term, the trial court's failure to issue such a definition does not require a new trial." *Id.*

## C. The Meaning of "Universal Malice"

¶ 11    Colorado statutes do not define "universal malice."  Nor is the phrase defined in the Model Jury Instructions.[1]  So we consult case law to discover its meaning.

¶ 12    Long ago, our supreme court addressed the concept of universal malice in *Longinotti v. People*, 46 Colo. 173, 102 P. 165 (1909).  At the time, a Colorado statute described one form of first degree murder as murder "perpetrated by any act greatly dangerous to the lives of others, and indicating a depraved mind regardless of human life."  *Id.* at 176, 102 P. at 166 (quoting R.S. 1908, § 1624).  The court reasoned that, although every fatal act is greatly dangerous to the life of the person killed, the legislature classified a killing act "indicating a depraved mind regardless of human life" as first degree murder "not because [the killer] has atrociously murdered a particular individual, but because his act has evinced universal malice, a malice against mankind in general."  *Id.*  The

---

[1] The Model Jury Instructions were amended in 2014 to remove any definition of "universal malice."  *Compare* COLJI-Crim. F(265) (2008) (defining universal malice), *with* COLJI-Crim. F (2014) (containing no such definition), *and* COLJI-Crim. F (2020) (containing no such definition).

court approved the following explanation: "By 'universal malice,' we do not mean a malicious purpose to take the life of all persons. It is that depravity of the human heart, which determines to take life upon slight or insufficient provocation, without knowing or caring who may be the victim." *Id.* at 181, 102 P. at 168 (citation omitted). We call this "the *Longinotti* definition."

¶ 13    Decades later, in *People v. Jefferson*, 748 P.2d 1223 (Colo. 1988), the supreme court first considered a first degree murder statute that explicitly mentioned "universal malice." The statute read then as it does now: extreme indifference murder occurred "[u]nder circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally." *Id.* at 1230 (citing § 18-3-102(1)(d), C.R.S. 1982). When discussing "universal malice," the court used the *Longinotti* definition but also substituted other descriptions. For instance, the court referred to "those acts greatly dangerous to the lives of persons other than the one killed, revealing a depraved mind," a "notion of cold-bloodedness," and a case where "the circumstances of [the killer's] actions evidence that aggravated recklessness or cold-bloodedness which has come to be known as 'universal

malice.'" *Id.* at 1228, 1231, 1232. Indeed, the court explained that "[f]rom the earliest statutory formulation which proscribed 'depraved heart murder' through the narrowing construction of *Longinotti,* and ultimately to the most recent formulation codified in the statute under review, the defining characteristic of the continuum has remained the same: 'aggravated recklessness.'" *Id.* at 1231.

¶ 14    Since *Jefferson,* the supreme court has continued to use various descriptions of universal malice in the context of extreme indifference murder. *See, e.g., Montoya v. People*, 2017 CO 40, ¶ 15 ("[E]xtreme indifference murder had become distinguishable from second degree murder *only* in the sense that the actual killing act had to be one objectively demonstrating a willingness to take life indiscriminately."); *Candelaria v. People*, 148 P.3d 178, 181 (Colo. 2006) (recognizing that extreme indifference murder includes "conduct that, by its very nature and the circumstances of its commission, evidences a willingness to take human life indiscriminately, without knowing or caring who the victim may be or without having an understandable motive or provocation"). The court has also clarified that, when in *Jefferson* it had "distinguished

the killing conduct necessary for extreme indifference murder as a type not directed against a particular person," the court "did not mean to suggest that one could not intentionally kill a particular individual in a manner demonstrating a willingness to take human life indiscriminately, or that doing so would not fall within" section 18-3-102(1)(d).  *Candelaria*, 148 P.3d at 182.

¶ 15　　Synthesizing this history, our supreme court has recently explained again that "the requirement that the killing conduct be engaged in under circumstances evidencing an attitude of universal malice manifesting extreme indifference to the value of human life generally" "*describe[s]* a killing act objectively demonstrating a willingness to take life indiscriminately."  *People v. Anderson*, 2019 CO 34, ¶ 15 (emphasis added).[2]

---

[2] In fact, the phrase "a willingness to take life indiscriminately" effectively captures the *Longinotti* definition, being "that depravity of the human heart, which determines to take life upon slight or insufficient provocation, without knowing or caring who may be the victim."  *Longinotti v. People*, 46 Colo. 173, 181, 102 P. 165, 168 (1909).  Killing "indiscriminately" is the functional equivalent of killing "without knowing or caring who may be the victim."  And because there is no degree of provocation that justifies the indiscriminate taking of human life, indiscriminate killing is by definition without sufficient provocation.  *Cf. People v. Lara*, 224 P.3d 388, 395 (Colo. App. 2009) ("A person does not act 'under circumstances evidencing an attitude of universal malice

## D. The Trial Court's Instructions Were Adequate

¶ 16    Garcia's tendered definition of "universal malice" mostly conformed to the *Longinotti* definition. As illustrated, however, the *Longinotti* definition is neither the exclusive nor the most recent formulation of universal malice. Rather, our supreme court has refined the concept to mean a willingness to take life indiscriminately. *See id.* In other words, circumstances "evidencing universal malice manifesting extreme indifference to the value of human life generally" are those "evidencing a willingness to take life indiscriminately." *Montoya*, ¶ 21. The question, therefore, is whether the trial court's instructions adequately conveyed that concept. If so, no additional definition was necessary. *See Payne*, ¶ 18; *see also People v. Phillips*, 91 P.3d 476, 484 (Colo. App. 2004) ("[N]o additional instruction is required when the original instructions adequately inform the jury."). We conclude that the court's instructions, which followed the statutory language, were adequate.

---

manifesting extreme indifference to the value of human life generally' if he or she acts in reasonable defense of others."), *overruled in part by People v. Pickering*, 276 P.3d 553 (Colo. 2011).

10

¶ 17    We presume that the jury applies the common meaning or meanings of terms. *People v. Sims*, 2020 COA 78, ¶ 19. And we may consult a recognized dictionary to determine how a reasonable juror would construe a term's meaning. *Id.*; *see Cowen v. People*, 2018 CO 96, ¶ 14.

¶ 18    In the ordinary sense, "universal malice" connotes an unrestricted willingness to do harm without sufficient justification. This follows because "universal" means "including or covering all or a whole collectively or distributively without limit or notable exception or variation" or "relatively unrestricted in application," while "malice" means an "intention or desire to harm another [usually] seriously through doing something unlawful or otherwise unjustified." Webster's Third New International Dictionary 1367, 2501 (2002). In addition, the statute modifies "universal malice" with the phrase "manifesting extreme indifference to the value of human life generally." § 18-3-102(1)(d). That phrase connotes a heightened awareness and disregard of a fatal risk as well as a total lack of concern or caring about human life. *See People v. Marcy*, 628 P.2d 69, 79 (Colo. 1981), *superseded by statute as recognized in Jefferson*, 748 P.2d at 1230; *Esparza-Treto*, 282 P.3d at 480.

11

And the phrase conveys this meaning in ordinary terms that do not require a definitional instruction. *See Esparza-Treto*, 282 P.3d at 480. Hence, the statutory language makes clear that the actor's unrestricted and unjustified willingness to harm others includes the potential to cause death. *See also* § 18-3-102(1)(d) (extreme indifference murder occurs when the defendant knowingly causes death under the circumstances described in the statute); *Montoya,* ¶ 16. This common understanding of the statutory language — reflected in the instructions here — conveys the concept of "a willingness to take life indiscriminately." *Anderson*, ¶ 15.

¶ 19    Because the instructions were accurate and adequate, and because the jury expressed no confusion about their meaning, we conclude that the trial court did not abuse its discretion by declining to further instruct the jury on universal malice. *See Esparza-Treto*, 282 P.3d at 480.[3]

---

[3] In so concluding, we necessarily disagree with Garcia's suggestion that an additional instruction on universal malice was necessary given the particular fact pattern here. Finally, to the extent Garcia argues that his tendered instruction encompassed his theory of the defense and thus the trial court was obligated to give it, we do not consider this argument because he raised it for the first time in his reply brief. *See People v. Dubois*, 216 P.3d 27, 28 (Colo. App. 2007), *aff'd*, 211 P.3d 41 (Colo. 2009).

12

### III. The Trial Court's Reasonable Doubt Explanations

¶ 20    Next, we conclude that the trial court's explanations of reasonable doubt do not require a new trial.

#### A. Additional Facts

¶ 21    During voir dire of prospective jurors, the trial court gave a definition of reasonable doubt that tracked the model instruction. *See* COLJI-Crim. E:03 (2020).  The court then had the following exchange with a prospective juror:

> THE COURT: Did you drive to the courthouse today?
>
> PROSPECTIVE JUROR: I did.
>
> THE COURT: Did you come to a red light?
>
> PROSPECTIVE JUROR: Probably, yes.
>
> THE COURT: Okay.  And when the light turned green, did you proceed through the intersection?
>
> PROSPECTIVE JUROR: Yes.
>
> THE COURT: Did you get in the middle and hesitate?
>
> PROSPECTIVE JUROR: No.
>
> THE COURT: So you had enough information that you wouldn't hesitate in the intersection, you would proceed?

PROSPECTIVE JUROR: Right.

THE COURT: So does that make sense, folks? That would be an example of proof beyond a reasonable doubt; you don't hesitate.

¶ 22 During the court's ensuing questioning of a different prospective juror, the juror confirmed that he had driven on a highway to the courthouse and the highway had not been crowded. The court asked, "But usually when you get on a highway, do you have to hesitate because you don't know where the gap is for you to get on and you have to figure that out?" The prospective juror said, "That's what the sign is for." The court responded:

> Some situations, you hesitate when it's a matter of importance; and some situations, you have enough information and you make a call; and that's totally up to each of you. But you have the obligation, when you go back into the jury room, to talk about the case. My guess is, all 12 would not agree on every case to begin with.
>
> So it's your obligation to apply your view of the evidence; but also, it's your obligation to work with the other jurors to determine what they observed of the evidence. Is that something you think you could do, sir?

The prospective juror answered, "Yes."

¶ 23 Neither party objected to any of the above.

¶ 24    At the close of evidence, the court again gave oral and written instructions consistent with the model jury instruction.  *See* COLJI-Crim. E:03.  The instructions explained, in part, that reasonable doubt "is a doubt which is not a vague, speculative or imaginary doubt, but such a doubt as would cause reasonable people to hesitate to act in matters of importance to themselves."

## B.    Analysis

¶ 25    As noted, we review de novo whether jury instructions accurately informed the jury of the law.  *Johnson v. People*, 2019 CO 17, ¶ 8.  "An instruction that lowers the prosecution's burden of proof below reasonable doubt constitutes structural error and requires automatic reversal."  *Id.*

¶ 26    When assessing whether a trial court improperly instructed on reasonable doubt, we ask whether there is a reasonable likelihood the jury applied the instructions in an unconstitutional manner.  *Id.* at ¶ 14.  To answer that question, we do not consider an instruction in isolation; rather, we view it in the context of the record as a whole and consider the illustration's nature, scope, and timing.  *Id.* at ¶¶ 14, 18; *People v. Tibbels*, 2019 COA 175, ¶ 32 (*cert. granted* June 29, 2020).  If, given the context of the entire

record, "the trial court properly instructed the jury on the law — even with 'objectionable language . . . [in] the trial court's elaboration of the reasonable doubt instruction' — then there is no violation of due process." *Johnson*, ¶ 14 (quoting *People v. Sherman*, 45 P.3d 774, 779 (Colo. App. 2001)); *People v. Avila*, 2019 COA 145, ¶ 45. With these principles in mind, we conclude that the trial court's elaboration of reasonable doubt in voir dire here — while ill-advised — did not lower the prosecution's burden of proof when viewed in light of the entire record.

¶ 27     The United States Supreme Court, the Colorado Supreme Court, and many divisions of this court have cautioned that "further attempts by courts or parties to define 'reasonable doubt'" beyond the standard instruction "do not provide clarity." *Johnson*, ¶ 13 (citing *Holland v. United States*, 348 U.S. 121, 140 (1954)); *Tibbels*, app. (collecting cases). Even so, appellate courts have concluded that the extraneous reasonable doubt analogies given in various cases did not lower the prosecution's burden of proof. *See Johnson*, ¶ 18; *Tibbels*, ¶¶ 35-40; *Avila*, ¶¶ 46-48; *People v. Flynn*, 2019 COA 105, ¶ 49. *But see People v. Knobee*, 2020 COA 7, ¶ 49 (*cert. granted* June 29, 2020).

¶ 28    Assuming without deciding that the trial court's comments in voir dire here amounted to a jury instruction, we reach the same conclusion. As in those cases where appellate courts have affirmed a conviction despite a problematic reasonable doubt analogy, "the trial court provided the instruction to the jury verbally and only once." *Johnson,* ¶ 18; *see Tibbels,* ¶ 37; *Avila,* ¶ 47; *Flynn,* ¶ 49. "It was not mentioned or referenced again throughout the entirety of the proceedings, including closing arguments." *Johnson,* ¶ 18. "The court read the correct definitions of reasonable doubt and the burden of proof immediately preceding the improper verbal instruction." *Id.*; *see Avila,* ¶ 47; *Flynn,* ¶ 49. "Additionally, the court correctly instructed the jury numerous times regarding the presumption of innocence, reasonable doubt, and the burden of proof." *Johnson,* ¶ 18; *see Tibbels,* ¶ 39; *Avila,* ¶ 47.

¶ 29    Also, this case is distinguishable from *Knobee,* where the division reversed on this issue. The trial court in that case said during a colloquy with a prospective juror, "I don't know how best to explain [reasonable doubt]. *It is a standard that we use a lot of times, beyond a reasonable doubt,* when we do important things in our lives, *like buying a home, or choosing doctors, or whatever.*"

*Knobee*, ¶ 31.  The court then asked the juror, "*Can you hold the People to that burden and not let them by on anything less, and not require them to prove anything more?*"  *Id.*  The juror answered in the affirmative.  *Id.*

¶ 30    The division concluded that the trial court's statements trivialized reasonable doubt and required reversal due to a combination of four reasons — at least two of which are absent here.  *See id.* at ¶ 34.  First, the judge's commentary in *Knobee* was "part of a lengthy, highly emphasized, Socratic colloquy with individual prospective jurors," different from the isolated comment in *Johnson.*  *Id.* at ¶ 41.  Here, however, the trial court's traffic-light comment was fleeting and not highly emphasized.  Second, the trial court in *Knobee* extracted a commitment from a prospective juror to apply the notion of reasonable doubt as the court had described, *and* that juror was ultimately empaneled.  *See id.* at ¶¶ 45-46.  The trial court here extracted no commitment from a juror to apply the reasonable doubt standard as described in the court's traffic-light

analogy, and the prospective juror who took part in that analogy was not empaneled.[4]

¶ 31     Considering all this, we do not discern a reasonable likelihood that the jurors applied the trial court's isolated analogy in a manner that reduced the prosecution's burden of proof.

## IV.     Prosecutorial Misconduct

¶ 32     Garcia argues that the prosecutor committed misconduct by (1) referencing domestic violence during voir dire and opening statement "without any basis for believing such evidence would be admitted"; and (2) improperly evoking sympathy for the victims.  We discern no reversible error.

### A.     Statements Regarding Domestic Violence

¶ 33     During voir dire and opening statement, the prosecutor mentioned that one victim, Duran, would not be testifying at trial, noted that she had avoided the attempts to serve her a subpoena, asked prospective jurors whether they understood that "there are

---

[4] The trial court's question about entering a highway did not truly go anywhere.  The prospective juror did not respond directly, and the court then made the innocuous remark that in "[s]ome situations, you hesitate when it's a matter of importance; and some situations, you have enough information and you make a call."

reasons why domestic violence victims may not want to prosecute a case," and referred to her nonappearance as related to the "domestic violence component to this case." Defense counsel did not object.

¶ 34    On appeal, Garcia says the prosecutor lacked a good faith basis "to inject the 'domestic violence component'" into the trial. *See People v. Adams*, 708 P.2d 813, 815 (Colo. App. 1985) ("A prosecutor should not intentionally use the voir dire to present factual matter which the prosecutor knows will not be admissible at trial or to argue the prosecution's case to the jury.") (citation omitted). But considering "the context of the argument as a whole and in light of the evidence before the jury," we conclude that the prosecutor did not commit misconduct. *People v. Samson*, 2012 COA 167, ¶ 30.

¶ 35    Given that the charges were captioned as crimes of domestic violence in the complaint, the trial court in its introductory remarks informed prospective jurors — *before* the prosecutor's remarks challenged on appeal — that the charges were "alleged to be an act of domestic violence." Both parties referenced domestic violence during voir dire — for example, defense counsel referred to the

20

charges as "an attempted murder alleged to be domestic violence and a [sic] handgun related." So we disagree that, at the time of the challenged statements, the prosecutor had no indication that evidence of domestic violence would be admitted at trial.

¶ 36    In any event, evidence of domestic violence was admitted. "An act of 'domestic violence' is 'an act or threatened act of violence' against a person with whom the perpetrator has had an 'intimate relationship,' such as current married persons, persons who had a past marriage, persons who currently or once lived together, and parents of the same child." *People v. Jaso*, 2014 COA 131, ¶ 12 (quoting § 18-6-800.3, C.R.S. 2020). The evidence presented at trial showed that Garcia was the father of two of Duran's children, Garcia and Duran lived together at the time of the charged incident, and he fired a gun three times in her direction during an argument after she said she had reported the car stolen. Together, the evidence permitted the inference that Garcia used or threatened violence against a person with whom he had an intimate relationship and that he did so "as a method of coercion, control, punishment, intimidation, or revenge." § 18-6-800.3(1). Thus, the prosecutor's reference to domestic violence was permissible and,

21

regardless, did not constitute plain error even to the extent it suggested that Duran did not appear at trial due to domestic violence. *See People v. Dominguez-Castor*, 2020 COA 1, ¶¶ 85-86 ("Prosecutorial misconduct is plain error only if it is 'flagrantly, glaringly, or tremendously improper.'") (citation omitted).

## B.    Victim Sympathy

¶ 37    In opening statement, the prosecutor said,

> At the end of the trial, you will have heard from [Duran's sister]; you will have heard from [another eyewitness]; you will have heard from Detective Peterson and other law enforcement professionals.  You will have some photographs for exhibits.  You will see the shell casings from the bullets, and you will know that the defendant is guilty.  At that point, [we] will ask you to hold this defendant accountable for what he did to see that justice is done in this case and to find him guilty. Thank you.

Defense counsel did not object.

¶ 38    In the prosecutor's rebuttal closing argument, the following exchange occurred:

> PROSECUTOR: We've already talked about the evidence that shows intent to kill and extreme indifference.  I'm going to ask you again like I did in opening, now is the time to do the right thing in this case.

DEFENSE COUNSEL: Objection, Your Honor. That's burden shifting – "Doing the right thing," "Now is the time to look at the evidence and determine that they proved it beyond a reasonable doubt."

THE COURT: It's closing argument. So the jury knows that the burden of proof is on the prosecution. Go ahead.

PROSECUTOR: See that justice is done in this case and find this defendant guilty. Thank you.

¶ 39    On appeal, Garcia argues that the prosecutor improperly indicated that a guilty verdict was necessary to do justice for the victims. We conclude that this claim was not preserved. Defense counsel at trial framed the objection as "burden shifting," not as an improper call for the jury to return a guilty verdict to do justice for the victims. Thus, we review for plain error. *See Martinez v. People*, 2015 CO 16, ¶ 14 (claim is unpreserved when the defendant on appeal alters the grounds for objection). "An error is plain if it is obvious, substantial, and so undermined the fundamental fairness of a trial as to cast serious doubt on the reliability of the conviction." *Dominguez-Castor*, ¶ 85.

¶ 40    The prosecutor's appeal to justice was so minimally prejudicial that reversal is not required under any standard. The prosecutor's

argument was brief and a small part of summation. *See People v. Carter*, 2015 COA 24M-2, ¶ 73 (concluding that these factors mitigated the prejudicial effect of improper argument). In opening statement and in closing argument, the prosecutor asked the jury to "do the right thing" only after discussing the evidence. In context, the prosecutor asked the jury to "hold [Garcia] accountable" because the evidence tended to show Garcia was guilty, and the jury likely would have understood his statements accordingly.

¶ 41    In sum, we are not persuaded that the prosecutor's comments "so inflamed and impassioned" the jury "that it could not render a fair and impartial verdict" based on the evidence. *See People v. Mason*, 643 P.2d 745, 753 (Colo. 1982) (quoting *People v. Elliston*, 181 Colo. 118, 126, 508 P.2d 379, 383 (1973)). Thus, any error was harmless and surely did not constitute plain error. *See Dominguez-Castor*, ¶ 86.

¶ 42    Finally, because we have assumed only one harmless instance of prosecutorial misconduct, there is no cumulative error upon which to reverse. *See Townsend v. People*, 252 P.3d 1108, 1112 (Colo. 2011).

24

## V.    Conclusion

¶ 43    The judgment is affirmed.

JUDGE HAWTHORNE concurs.

JUDGE TERRY specially concurs.

JUDGE TERRY, specially concurring.

¶ 44     I concur in the majority's reasoning and the result reached.  I write separately to emphasize that trial courts should not attempt to explain or simplify application of the reasonable doubt standard.

¶ 45     I agree with the majority that the reasonable doubt analogies in this case did not improperly lower the prosecution's burden of proof.  This is so because the situations that the trial court described when explaining reasonable doubt were clear to the jury and were not a matter of uncertainty.  The court emphasized situations where the juror had enough information to make a decision and did not hesitate in doing so.  Thus, because there was no uncertainty in these analogies, the burden of proof was unaffected.

¶ 46     However, although I conclude that reversal is not required, I emphasize that trial courts should not impart reasonable doubt analogies to juries.  Comparing reasonable doubt to the decisions one makes in everyday situations, such as while driving, tends to make jurors think that deciding whether a defendant is guilty is a decision that can be made as quickly and casually as the decision whether to enter an intersection or merge onto a highway.  Such

decisions are far simpler than deciding whether a defendant accused of a crime is guilty or not. *See People v. Knobee*, 2020 COA 7, ¶ 39 (*cert. granted* June 29, 2020) ("Few decisions that people make have the gravity of deciding whether to convict an accused person of a crime."). Because analogies that compare reasonable doubt to everyday decisions tend to oversimply the concept of reasonable doubt, such analogies should not be imparted to jurors or potential jurors. *Cf. Johnson v. People*, 2019 CO 17, ¶ 13 ("[A]ttempts by courts or parties to define 'reasonable doubt' do not provide clarity.").