22CA1686 Peo v Aragon 04-02-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA1686
Arapahoe County District Court No. 21CR1998
Honorable Elizabeth Weishaupl, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

David Cristobal Aragon,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE JOHNSON
Harris and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 2, 2026

---

Philip J. Weiser, Attorney General, Sonia Raichur Russo, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Kira L. Suyeishi, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, David Cristobal Aragon (Aragon), appeals the judgment of conviction entered on jury verdicts finding him guilty of two counts of second degree assault.  Aragon contends that (1) the district court erred by failing to define "harm" in the jury instruction for second degree assault, section 18–3–203(1)(h), C.R.S. 2025; (2) there was insufficient evidence to support his convictions; (3) his equal protection rights were violated because he was convicted under a statute imposing a harsher penalty for conduct that could have been subject to a less severe penalty; (4) the court allowed the prosecutor to engage in prosecutorial misconduct during voir dire; and (5) cumulative error requires reversal.

¶ 2     We agree with Aragon that the district court erred by failing to define the word "harm" for the jury and that the error was plain. But we disagree with Aragon that there was insufficient evidence to support his conviction based on the definition of "harm" enunciated in *Plemmons v. People*, 2022 CO 45, ¶¶ 43, 52 (*Plemmons II*). Therefore, although the jury instruction error compels us to reverse Aragon's judgment of conviction, the prosecutor is not barred by double jeopardy to retry Aragon.  And based on our disposition, we

need not address his remaining contentions.  Accordingly, we reverse the judgment of conviction and remand the case to the district court for a new trial.

## I.    Background

¶ 3    In September 2021, Aragon's ex-girlfriend — who had obtained a protection order against him — unexpectedly arrived at the same party he attended for one of his family members.  The ex-girlfriend called the police and Officer William Idler (Officer Idler) arrested Aragon for allegedly violating that order.  Aragon was placed in handcuffs, but because of a recent surgery to his shoulder, one of his arms was in a sling, so the officers handcuffed Aragon's uninjured arm behind his back, while the handcuff was placed around the belt of the sling for his injured arm.  This arrangement permitted Aragon to have some movement of his arm in the sling.

¶ 4    Some of the later events were caught on the officers' body-cam videos.  Once arrested, Aragon had several seizure-like episodes where he was snorting and shaking at the scene and in the ambulance that had been called by officers to transport Aragon to the hospital.  In the emergency room, Aragon was placed in a separate patient room.  Shortly after, Aragon told hospital staff that

he needed to defecate, but he was told to wait. Aragon defecated on the floor of the room, and when a hospital staff member returned and opened the door, Aragon ran out yelling that he had gone to the bathroom and had "shit" all over himself.

¶ 5 Officer Glen Snow (Officer Snow) handcuffed Aragon and, along with Officer Idler, began to lead him toward the hospital exit. Aragon had another seizure-like episode and fell to the floor, defecated again, pulled his pants down, wiped or threw feces toward or on the officers, and continued to yell profanities at the officers and hospital staff.

¶ 6 Aragon was charged with two counts of second degree assault, two counts of third degree assault, and violation of a protection order. The jury convicted him of two counts of second degree assault in violation of section 18–3–203(1)(h) but acquitted him of third degree assault in violation of section 18–3–204(1)(b), C.R.S. 2025, as to Officer Idler, and violation of a protection order. The remaining third degree assault charge was dismissed by the prosecutor.

## II.    Jury Instruction

¶ 7    Aragon contends that the district court erred by failing to define the term "harm" for the jury either under *People v. Plemmons*, 2021 COA 10, ¶ 13 (*Plemmons I*) or *Plemmons II*, ¶¶ 43, 52.  We agree.

### A.    Waiver

¶ 8    The Attorney General contends that Aragon waived this contention because the prosecutor, defense counsel, and the court thoroughly reviewed the jury instructions, making edits and additions, and Aragon did not specifically ask for a definition for the word "harm" for second degree assault.

¶ 9    Waiver is the "intentional relinquishment of a known right or privilege."  *People v. Rediger*, 2018 CO 32, ¶ 39 (quoting *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984)).  To find waiver, "we must find that the defendant (or his counsel) knew of the right before relinquishing it."  *People v. Bott*, 2019 COA 100, ¶ 20.  Because waiver "extinguishes error, and therefore appellate review," we indulge "every reasonable presumption *against*" it.  *Phillips v. People*, 2019 CO 72, ¶¶ 18, 22 (quoting *Rediger, ¶¶* 39-40).  If waiver is not found, but the defendant failed "to timely assert a

4

right," the claim is forfeited. *Bott*, ¶ 22. The difference between waiver and forfeiture is that waiver requires intent, but forfeiture is usually the result of neglect. *Rediger*, ¶ 40. While "waiver extinguishes error," we will review a forfeited error under the plain error standard of review. *Id.*

¶ 10 We acknowledge that the parties' counsel and the district court in this case thoroughly reviewed the jury instructions. But we must examine the record to determine whether counsel impliedly waived the issue because "defense counsel considered raising the unpreserved contentions before the trial court but then, for a strategic or any other reason, discarded the idea." *Phillips*, ¶ 22.

¶ 11 Here, nothing in the record suggests that Aragon's counsel considered requesting an instruction defining "harm" and made a strategic decision not to. Because we must "indulge every reasonable presumption against waiver," we conclude that Aragon did not waive this claim but that it was forfeited. *Rediger*, ¶ 39 (quoting *People v. Curtis*, 681 P.2d 504, 514 (Colo. 1984)). We thus turn to whether the district court erred by not defining harm in Aragon's jury instruction.

## B.   Failure to Define Harm

¶ 12    Aragon contends that, because the jury was not instructed on the definition of "harm," the district court committed error.  We agree that Aragon was entitled to a definition of "harm."

### 1.   Standard of Review and Applicable Law

¶ 13    We review jury instructions de novo to ensure that the jury was properly instructed on the governing law.  *People v. Payne*, 2019 COA 167, ¶ 16.  District courts have "discretion in formulating jury instructions if 'they are correct statements of the law and fairly and adequately cover the issues presented.'"  *Id.* (quoting *People v. Nerud*, 2015 COA 27, ¶ 35).  Accordingly, whether a judge gives a particular jury instruction is reviewed for an abuse of discretion.  *People v. Garcia*, 2021 COA 80, ¶ 9.  A district court abuses its discretion if its "decision was manifestly arbitrary, unreasonable, or unfair, or was based on an erroneous understanding of the law."  *Id.*

¶ 14    It is undisputed that Aragon did not object to the jury instructions lacking a definition of "harm"; therefore, his contention is unpreserved.  We review an unpreserved contention of error for

6

plain error. *Hagos v. People*, 2012 CO 63, ¶ 14. Plain error is error that is obvious and substantial. *Id.*

¶ 15    Generally, an error is obvious when "the action challenged on appeal . . . contravene[s] (1) a clear statutory command; (2) a well-settled legal principle; or [3] Colorado case law." *People v. Pollard*, 2013 COA 31M, ¶ 40 (internal quotations omitted).

¶ 16    Under the substantiality factor, we must determine whether the error "so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Hagos*, ¶ 18 (quoting *Wilson v. People*, 743 P.2d 415, 420 (Colo. 1987)).

¶ 17    And when conducting plain error review, the supreme court has instructed that we must apply the law at the time of trial, not the law in effect on appeal. *See People v. Crabtree*, 2024 CO 40M, ¶¶ 55-57, 67.

### 2.    Analysis

¶ 18    The Attorney General contends that the court did not err by failing to define "harm" because *Plemmons I* did not mandate that a court must define that term for the jury.

¶ 19　　In that case, a division of this court determined that the statutory language for second degree assault in section 18-3-203(1)(h) was ambiguous.  *Plemons I*, ¶ 22.  That provision says, as relevant here, that a person commits second degree assault if "[w]ith the intent to *infect, injure, or harm* . . . a peace officer . . . [he or] she causes such person to come into contact with . . . feces."  *Id.* at ¶ 12 (emphasis added).  The defendant in *Plemmons I* contended that the evidence did not support a finding that she had intended to injure or infect the officers when she spit on them, and so the only other possibility was that she intended to harm the officers.  *Id.* at ¶ 13.

¶ 20　　The division determined that the term "harm" was ambiguous because it "could reasonably be interpreted in a number of different ways, including, among other things, physical injury or emotional, reputational, or financial damage."  *Id.* at ¶ 22.  The district court instructed the jury as follows:

> The term "harm" as it is issued in Instruction No. 10 & 11 means psychological or emotional harm.  It can include the following
>
> 1. Fear,
>
> 2. Anxiety,

3. Or any other type of significant distress

> that is based upon the danger of injury or infection from contact with bodily fluids. The defendant need not have acted with the intent to cause harm that is permanent or long-lasting in nature, but the defendant's intent must have been to cause psychological or emotional harm that is not fleeting or minimal in nature.

*Id.* at ¶ 42. The division concluded that the district court's interpretation of the word "harm" to mean psychological or emotional harm was consistent with the legislative history, and because the district court instructed the jury on that term, the second degree assault statute was constitutional. *Id.* at ¶¶ 30-31.

¶ 21 Because *Plemmons I* held that section 18–3–203(1)(h) contains an ambiguous word if "harm" is not defined, by implication the division concluded, and we agree, that a court must define that term to avoid a potentially constitutionally infirm statute upon which a defendant is convicted. *Id.* at ¶¶ 22-23. But it was precisely because the jury was instructed with a definition of "harm" in *Plemmons I* that the division upheld the defendant's conviction. *Id.* at ¶¶ 43-48. Therefore, we conclude that the district court erred by not defining the word "harm" and that the error was

9

obvious because *Plemmons I* was binding on the district court at the time of Aragon's trial.

¶ 22    We also conclude the error was substantial for three reasons.

¶ 23    First, Aragon did not have the benefit of *any* definition of "harm." As *Plemmons I* concluded, the district court in that case had defined "harm" to include "only psychological or emotional harm," which was "both consistent with the General Assembly's intent and an appropriate way of ensuring the second degree assault statute's constitutionality." *Id.* at ¶ 31.

¶ 24    Second, the Attorney General's argument that the error was not substantial because the jury was instructed that Aragon had to intend to infect, injure, or harm — that awareness of his actions was not sufficient — misses the point. Aragon does not argue that he did not "intend" to throw or smear feces on the officers; instead, he disputes that he did not form the requisite intent to infect, injure, or harm them with his actions. Indeed, defense counsel contended that he was showing the officers his feces to support that he (1) needed to go to the bathroom, but hospital staff had not permitted him to do so; (2) was sick; and (3) felt embarrassed that

10

he had gone to the bathroom in his pants. Therefore, the jury was not instructed on the legally correct intent standard.

¶ 25 Finally, we acknowledge that Aragon might have been convicted by the jury on a legally correct theory of liability because the prosecutor relied on the three possible ways in which Aragon could have completed the offense of section 18–3–203(1)(h). But we cannot be sure that Aragon was not convicted by the jury under the legally incorrect standard. *See People v. Mendenhall*, 2015 COA 107M, ¶ 45 ("[A] reviewing court may appropriately negate a verdict where a defendant is convicted on a legally inadequate basis of liability, even where the jury is instructed on more than one theory of liability.") (quoting *People v. Mantos*, 250 P.3d 586, 590-91 (Colo. App. 2009))).

¶ 26 Thus, we conclude that the lack of a definition of "harm" in Aragon's jury instructions was plain error. As a result, we reverse Aragon's convictions. But because Aragon also raises an argument that there was insufficient evidence to support his conviction, he contends that he cannot be retried. We turn to this issue next.

### III. Sufficiency of the Evidence

¶ 27     Aragon contends there was insufficient evidence to convict him for second degree assault under the standard set forth in *Plemmons II.*

### A. Standard of Review and Applicable Law

¶ 28     We review a challenge to the sufficiency of evidence de novo to determine whether the record contains sufficient evidence to support a conviction. *People v. McCoy*, 2015 COA 76M, ¶ 37, *aff'd,* 2019 CO 44. To evaluate whether there is sufficient evidence to support a conviction, we must determine "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010) (quoting *People v. Bennett*, 515 P.2d 466, 469 (Colo. 1973)). We must give the prosecution "the benefit of every reasonable inference which may be fairly drawn from the evidence." *Id.* at 1292. If there is evidence upon which one may infer an element of the crime, the evidence is

sufficient to sustain that element. *People v. Grant,* 174 P.3d 798, 811 (Colo. App. 2007).

## B.     Analysis

### 1.     *Plemmons II*

¶ 29     We must look to whether there was sufficient evidence to support Aragon's conviction based on *Plemmons II*, which was decided after Aragon's trial but is the current law articulating the standard for how "harm" should be defined in section 18-3-203(1)(h).  *See, e.g.*, *People v. Martinez*, 2024 COA 34, ¶¶ 47-49 (reviewing a sufficiency of the evidence claim for second degree assault, section 18–3–203(1)(h), under *Plemmons II*).

¶ 30     In *Plemmons II*, the supreme court made two points clarifying the definition of "harm."  First, the "psychological or emotional harm" caused by the defendant must not be "fleeting or minimal in nature." *Plemmons II,* ¶ 42 (quoting *Plemmons I*, ¶ 42).  Instead, the defendant must intend "to cause *prolonged* damage — whether physical, psychological, emotional, or some combination of the three — rather than temporary shock or minor discomfort." *Id.* at ¶ 43 (emphasis added).  Second, the "'harm' *must* flow from a very *particular* form of significant distress; namely, the fear of

13

disease because of uninvited exposure to another's bodily fluids."
*Id.* at ¶ 45.

### 2. The Evidence Was Sufficient Under *Plemmons II*

¶ 31    At most, Aragon argues he was reckless, but that he did not intend to harm the officers by causing them significant distress because they feared they might be exposed to disease from the invited exposure of his bodily fluids. We acknowledge that there is no direct testimony from the officers indicating they worried about getting a disease from Aragon's feces. But we must look at the evidence in the light most favorable to the prosecution, and a defendant's intent may be — and usually is — proved by circumstantial evidence. *See People v. Johnson*, 2024 CO 32, ¶ 36 ("Direct evidence of an individual's intent, such as an admission of their purpose in performing the prohibited act, is rare; consequently, 'a defendant's intent can, and often must, be proved by circumstantial evidence.'") (quoting *People in Interest of J.O.*, 2022 COA 65M, ¶ 20)).

¶ 32    Here, the evidence was sufficient because (1) Aragon indicated he was not feeling well; (2) there was significant testimony about the description of the feces being in liquid form and green; and

14

(3) there was a significant amount of feces at issue, and there were many places Aragon spread the feces on the officers. All of these reasons support our conclusion that there was sufficient evidence to prove that Aragon intended to "harm" the officers by causing *prolonged* damage — whether physical, psychological, or emotional — due to the fear of disease because of uninvited exposure to another's bodily fluids.

¶ 33   As the officers led Aragon out of the hospital, he said, "I have shit on myself" and "I have shit on my fucking hands," and then put his hand in the back of his pants, removed his hand, and said, "look at this shit." One officer testified that Aragon "collected" feces in his hand, "swiping" it on and "flinging" it at the officers. While the officers tried to control Aragon, he pulled down his pants and defecated onto the floor in front of the officers. During the officers' struggle to restrain Aragon, the videos show Aragon's hand touching the officers' arms.

¶ 34   There was also evidence that Aragon was sick.

- While awaiting the ambulance, one of the officer's body-cam videos showed Aragon being held up by officers because he was not steady, and Aragon said, "I don't feel good."

- Aragon then fell over and had his first seizure with officers seen holding his head to prevent it from hitting the pavement.

- One of the officers asked Aragon if he took medications for seizures and he said, "I do take meds, sir," although we acknowledge it is not clear that Aragon took medications for seizures or something else.

- Shortly after the first seizure episode, Aragon said that he needed to throw up and did so.

- When the ambulance arrived, Aragon had another seizure-like episode.

- There was significant testimony about Aragon's feces being green, loose stool, in the form of diarrhea.

- A nurse testified that diarrhea can be caused by food contamination, a virus, gastrointestinal distress, and intoxication.

¶ 35  And there was evidence about the amount of feces and the number of places Aragon touched or spread it on the officers.

- Officer Idler testified that, "[w]hile we . . . were trying to gain control of [Aragon's] hands, I felt him swipe with his right hand up from my legs and then he touched my hat."

16

- Officer Idler further testified that he "was able to smell feces;" he was lucky to have on a disposable mask because it was the height of the pandemic because Aragon got feces on the officer's hat; and that he had feces on his pants and chest.

- Officer Idler stated that, while Aragon was "collecting his feces in his hand" and as the officers were trying to control Aragon's hands "he swipe[d] [feces] on . . . my partner."

- Officer Snow testified that Aragon "end[ed] up swiping his hand at me, which [wa]s covered in feces, and grasping at my forearms which were also covered in feces."

- Officer Snow further testified that he "had feces covering my exposed forearms" and "portions on the front of my uniform." He also stated that he could smell the feces.

- Officer Snow testified that he put gloves on because Aragon had pulled down his pants and that he had feces on his exposed wrist, his forearm, and underneath his glove on his hand.

- Another officer testified consistent with Officers Idler and Snow that "both officers had feces on their arms, hands, on their exterior ballistic vests. Officer Idler had it on his hat."

- There was testimony from the nurse that she cleaned Aragon's feces off the officer's "hat, their arms, and uniforms."

¶ 36    The jury also viewed the body-cam videos, which corroborated that Aragon had pulled down his pants, his buttocks were exposed, the officers had feces on them, feces was visible on the floor of the emergency room, and the feces was green and in liquid form.

¶ 37    Most importantly, the jury saw the body-cam video in which Aragon was restrained on the hospital floor by the officers, and Aragon said, "I won't do it no more, I promise you, you got, I got you good enough, I'll stop, I'll stop."  Although Aragon's statement does not explicitly state he intended to harm the officers, the jury could infer that he was not simply being reckless but wanted to inflict prolonged psychological or emotional harm by fear of disease from contact with his feces.  *See Johnson,* ¶ 36.

¶ 38    We acknowledge that the evidence that Aragon intended to cause the officers "prolonged damage" was hardly overwhelming. But the "question is not whether it is possible to disagree with the inferences [drawn from the evidence], but rather, whether the inferences are reasonable when the evidence is viewed as a whole in the light most favorable to the prosecution."  *People v. Perez,* 2016

CO 12, ¶ 31. Here, although a reasonable jury could conclude that Aragon was not intending to harm the officers, a reasonable jury could also conclude that Aragon intended to cause "prolonged damage" to the officers by instilling them with fear that they might contract a disease from Aragon due to contact with Aragon's feces. *See Clark*, 232 P.3d at 1292.

## IV. Conclusion

¶ 39 We reverse the judgment and remand the case to the district court for a new trial.

JUDGE HARRIS and JUDGE SCHOCK concur.